## AMERICAN STEEL & WIRE COMPANY *v.* SPEED.

### ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 356.  Submitted January 11, 1904.—Decided February 23, 1904.

In a constitutional sense "imports" embrace only goods brought from a foreign country and do not include merchandise shipped from one State to another. The several States are not, therefore, controlled as to such merchandise by constitutional prohibitions against the taxation of imports, and goods brought from another State, and not from a foreign country, are subject to state taxation after reaching their destination and whilst held in the State for sale.

*Woodruff* v. *Parham,* 8 Wall. 123; *Brown* v. *Houston,* 114 U. S. 622, have never been overruled directly or indirectly by *Leisy* v. *Hardin,* 135 U. S. 100; *Lyng* v. *Michigan,* 135 U. S. 161, or other cases resting on the rule expounded in those cases.

Goods brought in original packages from another State, after they have arrived at their destination and are at rest within the State, and are enjoying the protection which the laws of the State afford, may, without violating the commerce clause of the Constitution, be taxed without discrimination like other property within the State, although at the time they are stored at a distributing point from which they are subsequently

to be delivered in the same packages, through the storage company to purchasers in various States.

Where the levy of a merchant's privilege tax violates no Federal right the mere determination of who are merchants within the state law involves no Federal question. The construction of the state law is conclusive and if it embraces all persons doing a like business there is no discrimination.

THE facts are stated in the opinion of court.

*Mr. Josiah Patterson* for plaintiff in error:

In the construction of the constitution or statutory law of a State, this court follows the uniform decisions of the highest court in such State, notwithstanding this court would have reached a different conclusion from an application of the principles of general jurisprudence. *Morley* v. *Lake Shore, etc., Ry. Co.,* 146 U. S. 162; *Miller* v. *Swann,* 150 U. S. 132; *Balt. Traction Co.* v. *Balt. Belt R. R. Co.,* 151 U. S. 137; *Marchant* v. *Penna. R. R. Co.,* 153 U. S. 380; *Fallbrook Irrigation Dist.* v. *Bradley,* 164 U. S. 112; *Aberdeen Bank* v. *County of Chehalis,* 166 U. S. 440; *Wilson* v. *North Carolina,* 169 U. S. 586; *Bank* v. *Skelly,* 1 Black, 436; *Christy* v. *Pridgeon,* 4 Wall. 196.

Where the court of last resort in the State has, previously to the controversy, placed an interpretation on a local statute different from the interpretation placed on it in the pending suit, this court may adopt either construction, in accordance with its own opinion of the rules of general law which should govern the case. *Roberts* v. *Nor. Pac. R. R. Co.,* 158 U. S. 1; *Wilson* v. *Ward &c. Co.,* 67 Fed. Rep. 674; *Nat. Foundry and P. Wks.* v. *Oconto Water Co.,* 68 Fed. Rep. 1006; *Knox County* v. *Ninth Natl. Bank,* 147 U. S. 91; *Bartholomew* v. *City of Austin,* 85 Fed. Rep. 359; *Jones* v. *Great Southern Fire Proof Co.,* 86 Fed. Rep. 370; *Louisville Trust Co.* v. *Cincinnati,* 76 Fed. Rep. 296.

Where the decision of a court of last resort in a State is adverse to some right claimed under the Constitution of the United States, or some law of Congress, and such decision does not involve the construction of the constitution of such State, or any of its local laws or usages, but the claim of right is denied

on the opinion of such state court as to the principles of general law applicable to the case, then such decision is not a precedent binding on this court, and the Federal questions presented will be determined by this court according to its own independent judgment of the principles of general jurisprudence involved in the controversy. *Boyce* v. *Tabb*, 18 Wall. 546; *Olcott* v. *Supervisors*, 16 Wall. 678; *Swift* v. *Tyson*, 16 Pet. 1; *Willis* v. *Commissioners*, 86 Fed. Rep. 872; *Hartford Fire Ins. Co.* v. *Chicago, M. & St. P. Ry.*, 70 Fed. Rep. 201.

Where a party brings a case on writ of error to the court of last resort in a State, and claims that he has been deprived by the decision of such court of some right secured to him under the Constitution of the United States, this court becomes the exclusive and final arbiter of such Federal question, and will, after giving the opinion of the state court respectful consideration, decide the case for itself, independently of any construction which such court of last resort may have placed on the constitution, or local laws and usages of such State. *Scott* v. *McNeal*, 154 U. S. 34; *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112; *Louisville & Nashville R. R. Co.* v. *Palmes*, 109 U. S. 244; *Central Trust Co.* v. *Citizens' Street Ry. Co.*, 82 Fed. Rep. 1; *State Bank* v. *Knoop*, 16 How. 369.

Subsec. 3, § 8, Art. I, Const., in its application to a subject which is national in its character, and admits and requires uniformity of regulation affecting alike all the States, means that Congress alone has the power to provide such regulations as the exigencies of commerce may require, and the absence of any legislation on the subject is equivalent to a declaration by Congress that commerce, as to that subject, shall be free. The importation of goods from one State into another is a subject of national importance, affecting the welfare of the whole country, and, therefore, the absence of any law of Congress in respect to an article which is the subject of interstate commerce, operates as an affirmative declaration that the importation of that article shall be free from any regulation or restriction whatever by the State into which such article is

imported. *Brown* v. *Houston*, 114 U. S. 622; *Bowman* v. *Chicago & Northwestern Ry. Co.*, 125 U. S. 507; *Leisy* v. *Hardin*, 135 U. S. 100; *Pittsburg & Southern Coal Co.* v. *Bates*, 156 U. S. 577.

Goods imported from one State into another are the subjects of interstate commerce, and in the absence of any law of Congress, they will remain under the protection of the Federal Constitution exempt from any regulation or interference on the part of the State into which they are imported, until the status of such goods is changed by mingling them with the general property of the State, and thereby terminating their character as subjects of interstate commerce. *Brown* v. *Maryland*, 12 Wheat. 436; *Leisy* v. *Hardin*, 135 U. S. 100; *Lyng* v. *Michigan*, 135 U. S. 161.

The power to tax is the power to destroy, and, therefore, the taxation of the subjects of interstate commerce is a regulation of "commerce among the several States," inhibited by the Constitution. *Leloup* v. *Mobile*, 127 U. S. 640; *Bowman* v. *Chicago & Northwestern Ry. Co.*, 125 U. S. 465; *Weston* v. *Charleston*, 2 Pet. 449; *Postal Tel. Co.* v. *Adams*, 155 U. S. 688.

The constitutionality of a tax imposed by a State is not to be determined by the manner of its imposition, or the agency through which it is collected, but by the subject on which the tax is imposed. If the tax operates as a burden on a subject of interstate commerce, it is obnoxious to the Federal Constitution, without regard to its character or the method of its enforcement. *Telegraph Co.* v. *Texas*, 105 U. S. 460; *Cook* v. *Pennsylvania*, 97 U. S. 566; *State Freight Tax*, 15 Wall. 232; *Bank Tax Case*, 2 Wall. 200; *Bank of Commerce* v. *New York*, 2 Black, 620.

As long as goods imported from one State into another remain in the original packages in which they were transported, they will continue the subjects of interstate commerce, and the owner of the goods, in the absence of any law of Congress, may sell them in the original packages in the

State into which they are imported, without restriction, interference or regulation by such State. *Brown* v. *Maryland,* 12 Wheat. 436; *Leisy* v. *Hardin,* 135 U. S. 100; *Lyng* v. *Michigan,* 135 U. S. 161; *May* v. *New Orleans,* 178 U. S. 496; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1; *Pabst Brewing Co.* v. *Terre Haute,* 98 Fed. Rep. 330.

The original package of commerce is a package, bundle or aggregation of goods put up for convenience of transportation into whatever covering or receptacle the importer may elect, and delivered by him to the carrier at the initial point of shipment, to be transported from one State into another; and where a number of smaller packages are, for convenience, placed within a larger package, or bound together in a bundle, such bundle or larger package will constitute the original package of commerce; and when the bundle is unbound, or the larger package opened, in order to expose the smaller packages for sale, the goods will become mingled with the general property of the State and cease to be subjects of interstate commerce. Cases cited *supra* and *Sawrie* v. *Tennessee,* 82 Fed. Rep. 615; *Keith* v. *The State,* 10 L. R. A. 430; *McGregor* v. *Cone,* 39 L. R. A. 484; *Guckenheimer* v. *Sellers,* 81 Fed. Rep. 997; *Austin* v. *State,* 17 Pick. (Tenn.) 563.

When goods designed for exportation from one State into another State start on their journey at the initial point of transportation, they at once become subjects of interstate commerce, and are protected by the Federal Constitution from any interference or regulation by any State through which they may pass, until they reach their ultimate destination, notwithstanding, on the way, they may be delayed for a reasonable time on account of inadequate means of transportation, or for reshipment, or assortment, or distribution, or on account of any accident, or any other cause which may supervene to prevent the goods going directly from the initial point of shipment to the point of destination. *Coe* v. *Errol,* 116 U. S. 517; *The Daniel Ball,* 10 Wall. 557; *Howe Machine Co.* v. *Gage,* 100 U. S. 676; *Diamond Match Co.* v. *Ontonagon,* 188 U. S.

82; *Kelley* v. *Rhoads*, 188 U. S. 1; *Caldwell* v. *North Carolina*, 187 U. S. 622; *State* v. *Engle*, 5 Vroom (N. J.), 425; *State* v. *Carrigan*, 10 Vroom (N. J.), 35; *Passenger Cases*, 7 How. 405; *Head Money Cases*, 112 U. S. 580; *New York* v. *Compagnie &c.*, 107 U. S. 59.

As the absence of legislation on the part of Congress is equivalent to a positive declaration that interstate commerce shall be free, it follows that its subjects may be transported from one State into another, and there sold in the original packages, without the imposition of burdens of any kind, and that the imposition of a tax on such subjects by the State into which they are imported cannot be justified or upheld on the ground that the tax is equal and applies impartially to all goods of like character within the limits of such State. *Robbins* v. *Shelby County Taxing Dist.*, 120 U. S. 489; *Leloup* v. *Port of Mobile*, 127 U. S. 640; *Asher* v. *Texas*, 128 U. S. 129; *Stockard* v. *Morgan*, 185 U. S. 27.

When goods imported from one State into another, whether in the original packages of commerce or not, are, by the State into which they are imported, made subjects of an invidious and discriminating tax, because of their foreign origin, the Federal Constitution will intervene to protect them from such invidious or discriminating tax, and its protection will continue as long as the goods can be identified, and the invidious discrimination exists. *Welton* v. *Missouri*, 91 U. S. 275; *Brown* v. *Maryland*, 12 Wheat. 436; *Woodruff* v. *Parham*, 8 Wall. 123; *State Freight Tax*, 15 Wall. 232; *Minneapolis Brewing Co.* v. *McGillivray*, 104 Fed. Rep. 258.

*Mr. Charles T. Cates, Jr.*, Attorney General of the State of Tennessee, with whom *Mr. James M. Greer* and *Mr. W. H. Carroll* were on the brief, for defendant in error:

The judgment of the Supreme Court of Tennessee is final, conclusive and not reviewable by this court in respect of the questions of fact involved in said judgment. *Dower* v. *Richards*, 151 U. S. 664; *In re Buchanan*, 158 U. S. 36. And of the

interpretation, and application to the facts found, of the constitution and statutes of Tennessee as declared in said judgment. *Western Union Tel. Co.* v. *Gottlieb*, 190 U. S. 425; *New York* v. *Roberts*, 171 U. S. 661.

That plaintiff in error was carrying on the business of a merchant, and as such properly assessed for taxes, within the sense and meaning of the Tennessee statutes. *State* v. *Smith*, 5 Humph. 394; *Taylor* v. *Vincent*, 12 Lea, 282, distinguished. See *Kurth* v. *State*, 86 Tennessee, 134, 137, and see acts of 1885, c. 1, § 15; of 1887, c. 2, § 16; of 1901, c. 174, § 27.

The whole matter involving the status of plaintiff in error as a merchant and its liability to be assessed as such, was, on the appeal of plaintiff in error, laid before the state board of equalization where the assessment as made was in all respects affirmed. This is final as to all matters passed upon by it. Acts of 1901, c. 174, sec. 38, subsec. 10; acts of 1899, c. 4435, sec. 39, subsec. 10; *Grundy County* v. *Tenn. Coal Co.*, 94 Tennessee, 305; *Ward* v. *Alsup*, 100 Tennessee, 750.

The tax assessed against plaintiff in error as a merchant contains no element of discrimination against it as a foreign dealer, or otherwise. *Oliver Finney Grocery Co.* v. *Speed*, 87 Fed. Rep. 409, 412. That it is not a strict *ad valorem* tax is conclusively shown by the provision in the revenue acts relating to the assessment of personal property. Acts of 1899, c. 435, sec. 8, class 9; acts of 1901, c. 174, sec. 8, class 9.

Section 30, art. II of the constitution of Tennessee has been before the state Supreme Court in a number of cases and it has been uniformly decided that the exemption therein provided applies only to the manufactured article in the hands of the manufacturer at his place of business, and that it does not exempt goods or articles manufactured of the produce of the State, in the hands of the merchant or dealer, from the merchant's tax. *State* v. *Crawford, McNeil & Co.*, 2 Head, 461.

The taxing acts are in no sense discriminatory against plaintiff in error as a foreign dealer or its goods as articles manufactured in another State. *New York State* v. *Roberts*, 171

U. S. 658, 666; *Bell Gap R. R. Co.* v. *Pennsylvania,* 134 U. S. 232.

The tax assessed against plaintiff in error as a merchant is not in violation of Art. I, sec. 8, subsec. 3, of the Constitution of the United States, which empowers Congress "to regulate commerce with foreign nations, and among the several States, and among the Indian tribes."

Cases cited on brief of plaintiff in error do not support its contention.    See *Coe* v. *Errol,* 116 U. S. 517; *Brown* v. *Houston,* 114 U. S. 622; *Kelley* v. *Rhoads,* 188 U. S. 1.

Plaintiff in error was not entitled to escape taxation because its goods were taxed when "in transit" from one State to another, nor on the ground that goods were imported into Tennessee in original packages of commerce and there offered for sale in the original packages.

Cases on brief of plaintiff in error distinguished, and see *In re Rahrer,* 140 U. S. 545, 559; *Ficklen* v. *Shelby County,* 145 U. S. 21; *Woodruff* v. *Parham,* 8 Wall. 123.

The revenue statutes of Tennessee under which plaintiff in error was assessed upon the "average capital invested" by it in its business at Memphis was designed to require it and others in like situation with it, without discrimination, to contribute to the revenue of the State, a tax measured by the average amount of capital employed in said business, and is the same, uniform and non-discriminating tax laid upon domestic corporations, individuals and firms engaged in the same business. By whatever form or name plaintiff in error sought to cover up its business and evade the equal and just tax laws of Tennessee, the fact still remains that it was engaged in the business of a merchant in the city of Memphis.    *State ex rel.* v. *Roberts,* 152 N. Y. 59, 64; *Brown* v. *Houston,* 114 U. S. 622; *Pittsburgh Sou. Coal Co.* v. *Bates,* 156 U. S. 539; Judson on Taxation, § 181; *Emert* v. *Missouri,* 156 U. S. 318.    *May* v. *New Orleans,* 178 U. S. 496, is not in favor of plaintiff in error but supports the State's contention.

The principle underlying the question is not whether the

barges in which plaintiff in error brought its goods or the kegs
of nails and coils of wire were the original packages, but
whether said packages, that is the kegs of nails and coils of wire,
had been so used and dealt with as to make them a part of the
common mass of property in the State, and on the holding of
the Supreme Court of Tennessee on this question, based upon
the overwhelming facts as found by it, we submit that plaintiff
in error was properly assessed for taxation as a merchant upon
the "average capital invested" in its business in Tennessee.

MR. JUSTICE WHITE delivered the opinion of the court:

Whether the plaintiff in error is entitled to recover the sum
of certain taxes which were paid under protest, on the ground
that the taxes were repugnant to the Constitution of the United
States, is the question for decision on this record.

Section 28, article II, of the constitution of the State of
Tennessee, so far as pertinent to the issue to be decided, is as
follows:

"All property, real, personal or mixed, shall be taxed.
. . . All property shall be taxed according to its value,
that value to be ascertained in such manner as the legislature
shall direct, so that taxes shall be equal and uniform through-
out the State. No one species of property from which a tax
may be collected, shall be taxed higher than any other species
of property of the same value, but the legislature shall have
power to tax merchants, peddlers and privileges, in such man-
ner as they may from time to time direct. The portion of a
merchant's capital used in the purchase of merchandise sold
by him to non-residents and sent beyond the State, shall not
be taxed at a rate higher than the *ad valorem* tax on property."

Section 30, article II, of the same constitution provides:

"No article manufactured of the produce of this State shall
be taxed otherwise than to pay inspection fees."

The assessing and taxing laws of the State of Tennessee in
force at the time the taxes in controversy were levied provided,
first, for a general *ad valorem* tax upon all property; second, for

a merchants' tax separate from the general *ad valorem* levy, this latter tax being of two classes: A tax upon the average capital invested in business and a privilege tax, which was at a different rate and in other respects distinct from the merchants' tax just referred to. Moreover, at the time the tax assessments in question were made the statutes of the State of Tennessee concerning the merchants' tax contained the following:

"The term 'merchants,' as used in this act, includes all persons, co-partnerships or corporations engaged in trade or dealing in any kind of goods, wares, merchandise, either on land or in steamboats, wharf boats or other craft stationed or plying in the waters of this State, and confectioners, whether such goods, wares or merchandise be kept on hand for sale or the same be purchased and delivered for profit as ordered."

Moreover, the assessment laws, whilst providing that all "persons, copartners and joint stock companies engaged in the manufacture of any goods, wares, merchandise or other articles of value shall pay an *ad valorem* tax upon the actual cash value of their property, real, personal or mixed, . . ." made the following exception: "*Provided*, the value of articles manufactured from the produce of the State in the hands of the manufacturer shall be deducted in assessing the property." And a like exception qualified a provision imposing an *ad valorem* tax upon the capital and franchises of manufacturing corporations. Besides, the assessing statutes contained a general provision exempting "all growing crops of whatever nature or kind—the direct product of the soil of this State in the hands of the producer or his immediate vendee, and manufactured articles from the produce of this State in the hands of the manufacturer."

Whilst these laws were in force the officer whose duty it was to list the merchant tax assessed against the American Steel and Wire Company, which we shall hereafter call the Steel Company, both the general merchants' tax and a merchants' privilege tax. The company resisted the assessment, and,

after unsuccessfully pressing, through the administrative channels provided by the law of Tennessee, its objections, paid the tax under protest, and thereupon, as authorized by the law of Tennessee, commenced this suit to recover the amount paid.

Without going into detail, it suffices to say that the bill filed in the action to recover substantially alleged as follows: That the company was a New Jersey corporation, having a place of business in the city of Chicago, and owning and operating various plants for the manufacture of wire, nails, etc., in States other than the State of Tennessee. And, for the purpose of facilitating the sale and delivery of the goods by it manufactured, it had selected Memphis, Tennessee, as a distributing point, and had made an arrangement in that city with the Patterson Transfer Company, a corporation engaged at Memphis in the transfer of merchandise. By this arrangement the Patterson Transfer Company was to take charge of the products when shipped to Memphis, consigned to the Steel Company, store them in a warehouse there, assort them and make delivery to the persons to whom the goods were sold by the Steel Company. It was averred that the Patterson Transfer Company, in fulfilling its obligations under the contract, was in no sense a merchant, but only a carrier, and that the Steel Company, in storing and delivering its goods at Memphis, was not a merchant in Memphis, but was simply a manufacturer, delivering in the original packages goods made in other States to the persons who had bought them. In substance, besides, it was alleged that the goods in the warehouse in Memphis were merely in transit from the point of manufacture outside of the State of Tennessee to the persons to whom they had been previously sold. The levy of the tax was charged to be repugnant to the commerce clause of the Constitution of the United States: First, because the goods in the warehouse in Memphis were in the original packages as shipped from other States and had not been sold in Tennessee, and hence had not been commingled with the property of that State, and because, in any event, they had acquired no *situs* in Tennessee, as they

were moving in the channels of interstate commerce from the place where the goods were manufactured, for delivery to the persons to whom in effect they had been sold. Second. Because, as the State of Tennessee exempted from taxation articles manufactured from the produce of that State, no tax could be imposed by Tennessee upon articles manufactured from the produce of other States, without operating a discrimination against articles manufactured from the produce of other States. Issue was joined on the complaint. The trial court, deducing from the proof conclusions of ultimate facts in favor of the complainant, entered a decree in favor of the Steel Company. The case was taken to the Supreme Court of the State. In that court the validity of the tax was upheld and the judgment below was reversed. The questions raised concerning the repugnancy of the tax to the Constitution of the United States were expressly considered and decided adversely to the Steel Company. This writ of error was thereupon prosecuted.

The Supreme Court of Tennessee stated the facts as follows:

"Complainant is a corporation created under the laws of New Jersey. Its *situs* is in the State of New Jersey, and its principal business office is situated at Chicago, Ill. It is engaged in the manufacture of nails, staples, barbed and smooth wire, at different points north of the Ohio River. None of its manufactories are situated in Tennessee, and all of its products consigned to Memphis are shipped from points beyond the limits of this State.

"Prior to the first of February, 1900, its manufactured products were sold and distributed throughout the Southwest from Louisville, Ky.; Memphis, Tenn.; Greenville, Vicksburg, and Natchez, Miss.; and New Orleans, La. About that time the Patterson Transfer Company, a corporation created under the laws of Tennessee, having its *situs* at Memphis, and doing business at Memphis, represented to appellee that Memphis was the most available point in the Southwest at which to mass and distribute its manufactured products to its customers in that section. At this time, and for many years prior thereto,

the Patterson Transfer Company had been engaged in the business of transferring passengers and freights to and from the various depots at Memphis, and from the landings on the Mississippi River. Appellee entered into an arrangement with the Patterson Transfer Company, whereby said company was to receive its manufactured products at Memphis, assort them so as to separate the different kinds of nails, staples and wire, and then to deliver them, either to the jobbers at Memphis, or to the jobbers beyond the limits of Tennessee, over the various lines of railroads and steamboats running into Memphis, as directed by complainants.

"None of complainant's products are ever sold to the Patterson Transfer Company, or are by it sold to others, and neither its officers nor employés have any knowledge whatever of the price at which goods are sold by complainant. Under the arrangement between them, the business of the Patterson Transfer Company, in connection with complainant's products, is confined to their transfer to the warehouses, their assortment in the warehouses, the keeping of them in storage, and their subsequent delivery to the customers of the complainant, under its general or special orders, as below indicated.

"The goods of complainant are manufactured at different points, and it is convenient and useful, from a business point of view, to mass them at some place at which they can be assorted, and from which they can be distributed to complainant's customers. It is impracticable to assort the goods either at the river landing or at the railroad depots when they reach Memphis, and, in order to facilitate the work, the Patterson Transfer Company has rented three warehouses in which the goods are stored for the purpose of assortment and distribution, and for other purposes below indicated. These warehouses are rented exclusively for this purpose, and the manufactured products of complainant, and no other goods, are stored therein.

"The evidence further shows that, as a general rule, prior to the time the goods are shipped to Memphis, sales agents of the complainant canvass the Southwestern country, and make

contracts exclusively with jobbers; and in each instance where a contract is made it is embodied in writing, on a form prepared by complainant, in which is set down the amount of goods which constitutes the subject of the contract, and the time agreed upon within which they are to be delivered. The goods so contracted for are described as so many kegs of nails, so many kegs of staples, so many reels of barbed wire, or so many coils of smooth wire, according to the terms of the contract, in respect of the quantity agreed upon. But the contract does not specify the grade and quality of the goods desired. The grade and quality are left open, to be subsequently specified when the customer desires a delivery, as below stated. The customer can, when he makes his specification, select any grade of goods he desires, and, upon so selecting, they will be delivered to him, up to the quantity contracted for, within the time agreed upon, at prices contracted for applicable to the several grades. In fixing the price of its goods, the complainant always, except when necessary to lower prices in order to meet competition, figures in the freight on the goods.

"As above indicated, it is shown in the evidence that there are many different kinds of nails, as well as different kinds of barbed and smooth wire; and it is expressly stipulated in the contract that the customer shall have the privilege of specifying, during the life of the contract, the kind of wire, or kind of nails or staples he desires delivered to him under the contract. These contracts also specify from sixty to ninety days as the time within which the products are to be delivered; and at any time during the period prescribed in the contract the customer may designate the kind of goods he desires delivered under it.

"These contracts are made, usually before the goods arrive at Memphis, their point of destination, and generally the contracts are made in advance of the production of the goods at the complainant's factory. Usually the sales agents of the complainant, not only in advance of the shipment of the goods, but in advance of their production, canvass the Southwestern country—in the manner above stated—visiting the various

jobbers, ascertaining the amount of goods they will require
within sixty or ninety days, and the contract is prepared to the
purport above indicated, in which the complainant obligates
itself to deliver, at the price stated, as above mentioned, the
amount of goods contracted for therein, and the customer
agrees to receive and pay for that quantity, upon the goods
being delivered to him after he shall have made, and according
to, his specification, which he may make during the life of the
contract; the customer reserving the right, in the face of the
contract, to specify the exact grade or quality of goods he
desires delivered under it. He does this after the making of
the contract, and at any time he desires to do so, within the
life of the contract, by writing out his specification showing
precisely what grade of goods he desires, and forwards this
specification to the office of complainant in Chicago, and then
the goods, under an order from the Chicago office, addressed
to the Patterson Transfer Company at Memphis, are selected
by the latter out of the mass of goods belonging to the com-
plainant in the aforesaid warehouses in Memphis, and are
shipped by the said Patterson Transfer Company to the cus-
tomer who has signed the specification. This order from the
complainant to the Patterson Transfer Company is effected
through the agency of a copy of the specification, which is
forwarded to the latter from the complainant's central office
at Chicago, it being understood, according to the course of
business between the two companies, that the Patterson Trans-
fer Company will select out of the mass of goods those set out
in the specification, and will ship them to the customer whose
name is signed to the specification, upon receiving such copy
of the specification from the central office at Chicago.

"This method of transacting the business is modified in
practice, in so far as the fulfillment of contracts made with the
jobbers at Memphis is concerned. For the convenience of the
Memphis trade, complainant advises the Patterson Transfer
Company of the names of its customers at Memphis, and that
company is instructed to deliver the goods embraced in the

contracts with the Memphis jobbers, in the following manner: The Memphis jobber makes out his specification in duplicate, and addresses a letter to complainant, as in any other case; but, instead of forwarding this letter and his specification directly to complainant, he delivers the letter to the Patterson Transfer Company, and the Patterson Transfer Company at once delivers the goods so specified, attaching the dray receipt to a copy of the specification, and forwards the specification, letter and dray receipt to the office of complainant in Chicago, and that office makes out an invoice and sends it directly to the jobber. Another variation is made in the course of the business, in favor of the Memphis jobbers, to the following effect: Any jobber in Memphis who is a recognized customer of the complainant can, without any previous written contract, or other special agreement, make out a specification of the goods he desires, and hand this, in duplicate form, to the Patterson Transfer Company. Upon this being done it is the duty of the Patterson Transfer Company, under its general instructions from the complainant, to select out of the mass of goods in the warehouses, goods corresponding to those contained in the specification, and deliver them to such jobber, this delivery usually being made by the next day, or, at most, within two or three days. Other deliveries on specifications sent direct to the Chicago office are not usually made within less than six or eight days, and sometimes a longer period is required. When the Patterson Transfer Company receives from Memphis jobbers the specifications, which are the special subject of this paragraph, one copy is kept by it, and the other copy is forwarded to the office at Chicago, where, upon its arrival and reception, the customer is charged with the goods specified, at current prices.

"The testimony shows that of the mass of goods kept on hand in Memphis, in the above-mentioned warehouses, about ninety per cent ultimately goes to jobbers who reside outside of Memphis, and beyond the limits of this State. The remaining ten per cent goes to the Memphis jobbers in fulfillment of the

general contracts previously referred to, pursuant to specifica-tions thereunder made, and under specifications made without previous written contracts, the latter covering about two and one-half per cent of all the goods kept on hand.

"No one but an agreed or recognized customer of the complainant can make out a specification, or have goods delivered from the storehouses of the Patterson Transfer Company; and no goods are ever delivered or distributed to any one by the Patterson Transfer Company except under the express directions of complainant, or under general directions given by complainant to the Patterson Transfer Company, in favor of recognized and approved customers of the complainant, whose names are furnished by it to the Patterson Transfer Company.

"The testimony further shows that the quantity of goods which the complainant keeps on hand at Memphis fluctuates considerably, owing to the state of trade from time to time. Sometimes the stock is as low in value as $30,000, and sometimes the complainant has on hand a stock of the value of more than $100,000.

"Some of the goods, a very small amount, are shipped to Memphis by rail. Nearly all of these goods which come to the hands of the Patterson Transfer Company from this complainant are transported to Memphis on barges belonging to transportation companies, in which complainant has no interest, and which are engaged in the carrying trade. As a general rule, while the complainant endeavors to secure contracts covering its output before the goods are manufactured, yet it does not always do so; but, taking advantage of the seasons when there is a good stage of water in the rivers, which must be used in floating its products from its mills to Memphis, it masses its goods at the latter point in anticipation of future sales.

"The testimony shows that when goods are shipped from complainant's mills, consigned to Memphis, the Patterson Transfer Company is notified by the Chicago office that a certain quantity of complainant's products were shipped at

a certain time, on barges, to the port of Memphis. These barges are met at the river landing by the Patterson Transfer Company, which receives the goods, transfers them to its warehouses and assorts them. Then, from time to time, it ships the goods on specifications, as before explained. On receiving the goods they are credited to the complainant on the books of the Patterson Transfer Company, and, on being shipped out, they are charged on the same books to the complainant. When the goods reach Memphis they are always consigned to the complainant, in care of the Patterson Transfer Company.

"All the goods forwarded to Memphis are products of the factories of complainant. No part of them are ever purchased by it. Its sales agents are exclusively engaged in selling these products. They are produced by complainant beyond the limits of this State, and are made the subject of contracts by its sales agents throughout the Southwest, in the manner before explained. These sales agents report all contracts effected by them directly to the office in Chicago, whether made with the jobbers at Memphis, or elsewhere beyond the limits of this State. All invoices for goods, when sold by specifications in the manner above stated, are made out at the office at Chicago, and forwarded directly to the customer, in the manner and under the circumstances previously stated.

"Some of the complainant's goods are produced at one factory and some at another, and, consequently, when a purchaser contracts for the delivery to him, within sixty or ninety days, of a certain number of packages, it frequently turns out that some of the goods desired are the product of one factory, and some of another, and it is, accordingly, most convenient in the conduct of complainant's business that goods from complainant's various factories should be massed at some point where they can be dealt with in the manner before explained.

"Complainant's goods are put up in the following original packages: The nails and staples are put up in kegs, each keg weighing 100 pounds; the smooth wire in coils tied by wires,

and each coil weighing 100 pounds; the barbed wire on reels, the wire on each reel weighing 100 pounds. Each package is separately and distinctly made up at the factories for convenience of transportation, and is, in this form, delivered to the common carriers. In this form they are delivered at the initial point of transportation. In this form they are transported in barges, or by railroads to Memphis, and received by the Patterson Transfer Company. In this form they are assorted at the warehouses by the Patterson Transfer Company, and delivered by it to the complainant's customers at Memphis, under the circumstances previously stated, or to the various lines of steamboats and railroads running out of Memphis, consigned, under circumstances previously stated, to customers beyond the limits of Tennessee, and in this form they ultimately come to the hands of complainant's customers in such foreign States. Each package is separate and distinct in itself, and while no particular package is consigned to any special customer, each keg of nails and staples is marked so as to show exactly what the package contains, and each coil and reel of wire is marked with a tag showing what the coil or reel contains, and no package is ever changed in any particular from the time it leaves the factory until it ultimately reaches the hands of the customer.

"The testimony shows that Memphis has, within recent years become, by reason of its accessibility to railway and river transportation, a great distributing point; and it was selected as the basis of the operations which are the subject of the present controversy, by reason of these exceptional advantages.

"Other facts proven by the complainant are as follows: The testimony of Mr. Young, the tax assessor, shows that none of the cotton shipped into Memphis from the surrounding States pays any tax whatever, and that the manufacturers of lumber in Memphis pay no tax on lumber made from logs which are produced from the soil of this State."

With these facts in hand we are of opinion that the court

below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis, and were there held in store at the risk of the Steel Company, to be sold and delivered as contracts for that purpose were completely consummated.  All question, therefore, as to the power of the State to levy the merchants' tax based, on the contrary contention, being without merit, may be put out of view.  The other propositions pressed upon our attention require consideration.  They relate to two subjects: First, the asserted want of power of the State of Tennessee to tax because the goods were imported from another State, and were yet, it is contended, in the original packages; and, second, because of the alleged discrimination asserted to result from the provision of the state constitution exempting goods manufactured from the produce of the State.

1. Since *Brown* v. *Maryland*, 12 Wheat. 419, it has not been open to question that taxation imposed by the States upon imported goods, whether levied directly on the goods imported or indirectly by burdening the right to dispose of them, is repugnant to that provision of the Constitution providing that "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports." Article I, sec. 10, paragraph 3.  And *Brown* v. *Maryland* also settled that where goods were imported they preserved their character, as imports, and were therefore not subject to either direct or indirect state taxation as long as they were unsold in the original packages in which they were imported.  A recent case referring to the authorities and restating this elementary doctrine is *May* v. *New Orleans*, 178 U. S. 496.  Assuming that the goods concerning which the state taxes in this case were levied were in the original packages and had not been sold, if the bringing of the goods into Tennessee from another State constituted an importation, in the constitutional signification of that word, it is clear they could not be directly or indirectly taxed.  But the goods not having been brought from abroad, they were not imported in the legal sense and

were subject to state taxation after they had reached their
destination and whilst held in the State for sale. This is as
conclusively foreclosed by the decisions of this court as is the
doctrine resting upon the decision in *Brown* v. *Maryland*.
*Woodruff* v. *Parham*, 8 Wall. 123; *Brown* v. *Houston*, 114 U. S.
622. The doctrine upon which the cases rest was this, that
imports, in the constitutional sense, embraces only goods
brought from a foreign country, and consequently does not
include merchandise shipped from one State to another. The
several States, therefore, not being controlled as to such mer-
chandise by the prohibition against the taxation of imports,
it was held that the States had the power, after the goods had
reached their destination and were held for sale, to tax them,
without discrimination, like other property situated within
the State.

Those two cases, decided, the one more than thirty-five and
the other more than eighteen years ago, are decisive of every
contention urged on this record depending on the import and
the commerce clause of the Constitution of the United States.
The doctrine which the two cases announced has never since
been questioned. It has become the basis of taxing power
exerted for years, by all the States of the Union. The cases
themselves have been approvingly referred to in decisions in
this court too numerous to be cited, and we therefore content
ourselves by mentioning two of the cases where the doctrine
was restated. *Emert* v. *Missouri*, 156 U. S. 296; *Kelley* v.
*Rhoads*, 188 U. S. 1. But it is strenuously insisted that the
principle of the cases referred to, reiterated again and again
and uniformly followed for so long a period of time, has been
by inevitable implication overruled by the cases of *Leisy* v.
*Hardin*, 135 U. S. 100; *Lyng* v. *Michigan*, 135 U. S. 161, and
other cases resting on the rule expounded in those cases.

We might well leave the unsoundness of the proposition to
be demonstrated by what we have previously said, and also
by the fact that, in *Leisy* v. *Hardin* and *Lyng* v. *Michigan*, and
most of the similar cases relied on, the decisions in *Woodruff*

v. *Parham* and *Brown* v. *Houston* were referred to without even an intimation that those cases were deemed to be overruled or even qualified. The earnestness with which the contention is pressed induces us, however, briefly to point out the misconception upon which it rests. It results from assuming that the rule which governs in a case where there is an absolute prohibition is applicable where no such prohibition obtains. *Brown* v. *Maryland* illustrates the first of these cases, while *Woodruff* v. *Parham, Brown* v. *Houston, Leisy* v. *Hardin, Lyng* v. *Michigan* are examples of the other. Thus, in *Brown* v. *Maryland* there was an absolute want of power to tax imports, and it was held that a state enactment which operated to tax imports, whether directly or indirectly, was within the positive prohibition. In other words, that imports could not be taxed at all until they had completely lost their character as such. *Woodruff* v. *Parham* and *Brown* v. *Houston,* on the other hand, so far as interstate commerce was concerned, dealt with no positive and absolute inhibition against the exercise of the taxing power, but determined whether a particular exertion of that power by a State so operated upon interstate commerce as to amount to a regulation thereof, in conflict with the paramount authority conferred upon Congress. In order to fix the period when interstate commerce terminated, the criterion announced in *Brown* v. *Maryland,* that is, sale in the original packages at the point of destination, was applied. The court, therefore, conceded that the goods which were taxed had not completely lost their character as interstate commerce, since they had not been sold in the original packages. As, however, they had arrived at their destination, were at rest in the State, were enjoying the protection which the laws of the State afforded, and were taxed without discrimination like all other property, it was held that the tax did not amount to a regulation in the sense of the Constitution, although its levy might remotely and indirectly affect interstate commerce. In *Leisy* v. *Hardin* and *Lyng* v. *Michigan* the same question in a different aspect was presented. The goods had reached their

destination and the question was not the power of the State to tax them, but its authority to treat the goods as not the subjects of interstate commerce and to prohibit their introduction or sale. This was held to be a regulation within the constitutional sense, and therefore void. The cases, therefore, did not decide that interstate commerce was to be considered as having completely terminated at one time for the purposes of import taxation, and at a different period for the purpose of interstate commerce. But both cases, whilst conceding that interstate commerce was completely terminated only after the sale at the point of destination in the original packages, were rested upon the nature and operation of the particular exertion of state authority considered in the respective cases.

2. The discrimination is asserted to have arisen from the provision of the state constitution, saying that "no article manufactured of the produce of this State shall be taxed otherwise than to pay inspection fees." But in *Kurth* v. *State*, (1887) 86 Tennessee, 134, it was decided that this provision of the constitution referred only to a direct levy of taxation on articles manufactured of the produce of the State, and did not apply to taxes levied by virtue of the grant conferred by the constitution to tax "merchants, peddlers, and privileges, in such manner as they (the legislature) may from time to time direct." The two provisions, it was held, should be construed together, so that the one would not limit the other. We have been referred to no case decided by the Supreme Court of Tennessee modifying this interpretation of the state constitution, and its correctness is in effect directly affirmed by the ruling made by the court in this case. Now the tax complained of on this record is not the general *ad valorem* tax levied on property as such but is a merchants' tax, and is therefore not within the purview of the exemption clause from which it is asserted the discrimination arises. Construing the taxing statutes of the State the court below decided in this case that they equally apply to all merchants, and hence did not discriminate as against any member of the merchants' class. The argument

is made that under the facts found by the court below it was erroneously held that the Steel Company, because of the business which it carried on in the State of Tennessee, was a merchant within the statutes and the power to review this question, it is insisted, should be exerted because the question is Federal in its nature. The contention is without merit. As the levy of the merchants' tax violated no Federal right, the mere determination of who were merchants within the state law involved no Federal question. The construction of the state law being conclusive and embracing all persons doing a like business with the Steel Company, it follows that there was no discrimination. Conceding it to be true, as argued, that in the past there would seem to have been conflict of opinion in the court of Tennessee in interpreting various statutes concerning the merchants' tax, this contrariety does not concern the meaning of the statute construed in this case. As that statute has been construed by the state court as applying to all merchants and as embracing alike all persons engaged in the character of business which the Steel Company was carrying on, it follows that there is no ground upon which to predicate the complaint of undue discrimination. Nor do we think that the opinion of the Supreme Court of Tennessee in *Benedict et al.* v. *Davidson County,* not yet officially reported, (67 S. W. Rep. 806,) conflicts with the views just expressed. That case involved, not a merchants' tax, but the validity of a general *ad valorem* levy on property as such, and, therefore, affords no ground for the contention that manufacturers in Tennessee who shipped the goods by them made from the products of the State to a depot for sale, and there sold them under conditions and circumstances idertical with those presented here, could not be taxed as merchants under the law of Tennessee.

*Affirmed.*