## BINDERUP v. PATHE EXCHANGE, Inc., et al.

(Circuit Court of Appeals, Eighth Circuit. March 28, 1922.)

No. 5907.

Commerce ⬤→40(3)—Courts ⬤→289—Leasing of films by branch managers within state, to whom producers had shipped films from without state, held not "interstate commerce."

Where motion picture producers shipped films to their branch offices, which thereafter leased the films to theaters within the state and furnished films from the storehouses within the state, theater proprietor's action against producers for conspiracy to ruin his business by refusal to furnish him with films in violation of the Sherman Anti-Trust Act (Comp.

St. §§ 8820–8823, 8827–8830) *held* not within the jurisdiction of the United States District Court; the transactions not involving "interstate commerce."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

Sanborn, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action by Charles G. Binderup against the Pathe Exchange, Inc., and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Dana B. Van Dusen, of Omaha, Neb. (C. P. Anderbery, of Minden, Neb., and Norris Brown and Irving F. Baxter, both of Omaha, Neb., on the brief), for plaintiff in error.

William Marston Seabury, of New York City (John J. Sullivan, Arthur F. Mullen, and Eugene N. Blazer, all of Omaha, Neb., on the brief), for defendants in error.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The parties will be referred to herein as they appeared in the court below; the plaintiff in error as plaintiff, and the defendants in error as defendants.

The action is to recover threefold damages in the amount of $240,-051, under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830); the jurisdiction of the court being invoked solely upon the ground that the injury complained of is for a violation of that act of Congress, there being no diversity of citizenship. Neither the jurisdiction of the court nor the sufficiency of the complaint was questioned by the defendants by demurrer or any other motion, but defendants filed their answers and went to trial on the issues made by the pleadings. The trial was to a jury.

After counsel for the plaintiff had made his opening statement to the jury, the defendants moved for a directed verdict on the petition and opening statement of counsel. By leave of the court plaintiff amended some of the paragraphs of his petition, and thereupon the motion for a directed verdict was by the court sustained. To reverse this judgment, entered on the directed verdict of the jury, this writ of error is prosecuted. The court, as stated in a memorandum opinion, sustained the motion for a directed verdict upon two grounds:

First, that "the petition, as amended, does not show with sufficient clearness that the court has jurisdiction"; and, second, that "it fails to show with sufficient clearness or certainty any combination or conspiracy for an illegal purpose, or any combining together in concert to use illegal means, sufficient to justify the court in proceeding further in the trial of the case."

As the jurisdiction of the court is one of the grounds upon which the court directed a verdict, it must be disposed of first, as, if sustained, the court will be without jurisdiction to rule on the other contentions of the defendant—that the allegations of the complaint fail to state a cause of action, entitling plaintiff to recover a judgment against them, or the second ground which the court below stated for directing the verdict.

The complaint, after having been amended, charges the defendants to have conspired to ruin his motion picture business, and succeeded in their purpose by refusing to supply him with picture films. It alleges that he was the owner and operator of several motion picture theaters in different cities in the state of Nebraska, and also in the business of selecting and distributing to a circuit of moving picture theaters, commonly known as "the Binderup circuit," programs of moving picture films and advertising matter accompanying the same, through an agreement entered into between himself and the parties operating said moving picture theaters, in 20 cities named, all in the state of Nebraska; that the defendants, during the year 1915 and ever since then, and for several years prior, were engaged in the moving picture business either as producers and manufacturers of moving picture films, or as distributors thereof, or both; that the manufacturers made them in states other than the state of Nebraska, and when completed they were perfected and approved by them in the city of New York, and then they would publicly announce, by an extensive system of advertising, that the picture would be sent out from New York to their various branch offices in the various states of the United States, and particularly Omaha, Neb., and by their Omaha branch distributed to their patrons in the states of Nebraska, Iowa, and South Dakota; that the defendants controlled the distribution of the entire production of films in the United States, and they cannot be procured from others; that the defendant Omaha Film Board of Trade is a Nebraska corporation. Its articles of incorporation, made a part of the complaint, shows that it is organized for the purpose of promoting good will among those engaged in the film and picture business, to adjust controversies among themselves; that it shall be composed of persons or corporations engaged in the film industry, particularly distributors.

The membership is dependent upon the conditions that: (1) Continues to be affiliated with the corporation. (2) Is connected with some branch of the film and motion picture business, maintaining an office in Omaha. (3) Is the manager or the executive head of the firm of the branch of the firm he represents. (4) Abides by the terms of the articles of incorporation and by-laws. It then provides for the limit of membership, the dues, and officers of the corporation.

The by-laws, so far as material to this cause, after providing for the time of meetings, election, and duties of the directors and officers, provide that membership shall be limited to one representative from any company or individual engaged in the film business, maintaining an office in Omaha, and continues as long as he abides by and performs the terms provided by the by-laws; that membership is a valuable concession and personal privilege, not assignable without the consent of the corporation. The corporation shall have full power and determine all matters relative to and arising out of violations of the by-laws and impose punishment therefor; that in order to defend members against imposition, wrongful failure to accept C. O. D. shipments of films, a clearing house may be established for protective information, which shall be furnished to members free of charge and members shall report

such acts to the secretary, whereupon the secretary shall write to the party committing said acts for an explanation. By vote of a two-thirds majority a member may be expelled after notice and a trial. The board of directors may offer its services to induce settlements of disputes between parties in the business, or affecting trade and commerce.

It is further alleged that the defendant Graham was the branch manager at Omaha of the defendant Pathe Exchange, Inc., of New York and Nebraska, and also the presiding officer of the board of directors of the defendant Omaha Film Board of Trade. It then sets out the names of the branch managers at Omaha of the other defendant producers; that in carrying on his business it was necessary for plaintiff to procure films through the Omaha branch offices at Omaha, Neb., and at times it became necessary, in order to supply the demands of plaintiff, for the defendants to procure films outside of the state of Nebraska; that owing to his successful and profitable business the cupidity of the defendants was aroused, whereupon some of the defendants, which are named, requested him to give them a share of his patronage, and, upon his refusal, threatened to put him out of business by starting an exchange at Holdredge, Neb., and supply by underbidding all of the theaters of which his circuit was composed; that in April, 1919, the defendants, for the purpose of enabling them to control prices and dictate terms upon which they would transact business with their patrons operating theaters in the states of Nebraska, Iowa, and South Dakota, caused the said Omaha Film Board of Trade to be organized; that in leasing their films from the New York offices through the branch offices in Omaha they entered into written and oral contracts with the plaintiff, in accordance with the terms and conditions set out in the articles of incorporation and by-laws of the Omaha Film Board of Trade; that the title, control, and right to recall said films at all times was retained by the home offices in New York of the defendants; that plaintiff's business in the early part of 1919 had grown to large proportions and prior to September, 1919, was procuring pictures from some of the defendant film producers, who were members of the Omaha Film Board of Trade, and because he refused to buy from other members a spirit of hostility was aroused on their part against him, and they brought great pressure on the others, with whom he was dealing, to cease doing business with him; that thereupon all the defendants unlawfully combined in restraint of trade among the several states, with the intent of preventing him from continuing his said business, and for the purpose of monopolizing the business of distribution, and lease or sale within said territory of picture film programs, and eliminating the competition of plaintiff within said territory. To carry the conspiracy into effect, defendants caused false charges to be made against him before said Board of Trade, and without notice he was placed on the black or blue list of said Board of Trade, whereupon each of the defendants at once ceased and refused to transact any business with him, and ever since have refused to do so, by reason whereof his business has been ruined; that they sent notices thereof to the various moving picture theaters, comprising the Binderup circuit, that on and after September 15, 1919, they would have to order their programs and serv-

ice from the Omaha exchanges, as they would discontinue supplying the Binderup circuit with any programs, films, advertising matter, or service; that on September 1, 1919, he was removed from the so-called black or blue list, whereupon representatives, with whom he had no business dealings before, solicited his business, which he declined; that on November 10, 1919, defendants caused further charges to be made against him by members of said Board of Trade, and he was again placed on the black or blue list without notice or hearing; that he was denied service, as he was told, until his name was removed from the black or blue list; that a meeting of the grievance committee was had, at which a resolution was adopted that "he be kept on the black or blue list indefinitely, and that he be not supplied with any service whatsoever, for bookings for any house that does not actually and wholly belong to him outright, and none for these unless he deposit $1,000, subject to forfeit, if he violates any of the rules of the association"; that he refused to do so, and ever since the defendants have refused to have any dealings with him canceling unexpired contracts he had with them: that by reason of these acts he has suffered damages in the sum of $240,051, and prays judgment for treble that sum.

As there is no diversity of citizenship, the jurisdiction of the court could only be maintained, under the Sherman Anti-Trust Act, if the acts complained of involved interstate commerce. From the allegations in the complaint it is apparent that no shipments of programs, films, or advertising matter are ever made from the city of New York, to the motion picture theaters, but they are shipped to their respective branch offices in Omaha, Neb., and by them leased and furnished to the plaintiff or other theaters from their storehouses in Omaha. That being the fact, they had reached their destination in the movement from New York, and had come at rest in Omaha, and thereupon they ceased to be in interstate commerce, unless shipped from Omaha to another state, when they would again be in interstate transportation, but independently of the former shipment from New York. American Steel & Wire Co. v. Speed, 192 U. S. 500, 521, 24 Sup. Ct. 365, 48 L. Ed. 538; General Oil Co. v. Crain, 209 U. S. 211, 230, 28 Sup. Ct. 475, 52 L. Ed. 754; Banker Bros. v. Pennsylvania, 222 U. S. 210, 32 Sup. Ct. 38, 56 L. Ed. 168; Bacon v. Illinois, 227 U. S. 505, 33 Sup. Ct. 299, 57 L. Ed. 615; Public Utilities Com. v. Landon, 249 U. S. 236, 245, 39 Sup. Ct. 268, 63 L. Ed. 577; Southern Pacific v. Arizona, 249 U. S. 472, 477, 39 Sup. Ct. 313, 63 L. Ed. 713. In the General Oil Co. Case the court said:

"It [the oil] had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State, etc., v. Engle, supra, but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state, beyond a mere halting in its transportation. It required storage there, the maintenance of the means of storage, of putting it in and taking it from storage."

In Banker Bros. v. Pennsylvania the right of the state to tax defendants on sales of automobiles made in Pittsburgh, Pa., was in is-

sue. The facts were that the defendants kept no machines in stock, but would obtain them from a manufacturer in another state. A purchaser would order the machine from the defendants in Pennsylvania; the order being addressed to the defendants, the manufacturer's name (the Pierce Company) not appearing on the order. The defendants would forward the order to the Pierce Company, who would ship it to the defendants, at Pittsburgh, Pa., with draft on defendants attached to the bill of lading, less the commission. On paying the draft, the Banker Bros. would take up the bill of lading, receive the car from the carrier, and then deliver it to the buyer on his paying the balance of the purchase money. It was held that the Banker Bros. had the title and the shipment had become at rest in the state of Pennsylvania, though shipped in interstate commerce, and therefore subject to the tax imposed by the state.

In Bacon v. Illinois, it was held:

"Property brought from another state, and withdrawn from the carrier, and held by the owner with full power of disposition, becomes subject to the local taxing power, notwithstanding the owner may intend to ultimately forward it to a destination beyond the state."

In Southern Pacific Co. v. Arizona, it was claimed that—

"The proposed movement of the shows was 'interstate in character,' because they were engaged in a tour, beginning at the city of El Paso, Tex., and designed to extend through the states of Arizona and New Mexico and into the state of California, of which tour the movement from Tucson, Ariz., to Phœnix, Ariz., was a part."

In denying this contention the court said:

"At that time the shows were in the exclusive possession and control of the owner, exhibiting for six days at Tucson, and the application to the Southern Pacific Company, which was refused, shows incontrovertibly that the transportation to Tucson had terminated, and that no other transportation had then been contracted for.   *   *   *   The mere intention of the shipper to ultimately continue his tour beyond the state of Arizona did not convert the contemplated intrastate movement into one that was interstate."

In Public Utilities Com. v. Landon, the Kansas Natural Gas Company owned a system of pipe lines extending from Oklahoma to Kansas, and transported and sold natural gas to local companies in Kansas for ultimate sale by them to their customers, accepting therefor a definite proportion of the gross amount paid by the customers to the local companies. Permanent physical connections permitted gas to pass from the Natural Gas Company's pipe lines into the mains of the local companies. The question involved was whether the gas supplied by the local companies, after having been received from the Natural Gas Company, which transported it from Oklahoma, was interstate commerce. The court held it was not. In the opinion it said:

"That the transportation of gas through pipe lines from one state to another is interstate commerce may not be doubted. Also it is clear that as part of such commerce the receivers might sell and deliver gas so transported to local distributing companies free from unreasonable interference by the state. American Express Co. v. Iowa, 196 U. S. 133, 143; Oklahoma v. Kansas Natural Gas Co., 221 U. S. 229; Haskell v. Kansas Natural Gas Co., 224 U. S. 217. But in no proper sense can it be said, under the facts here disclosed, that sale and delivery of gas to their customers at burnertips by the local companies operat-

ing under special franchises constituted any part of interstate commerce. The companies received supplies which had moved in such commerce and then disposed thereof at retail in due course of their own local business. Payment to the receivers of sums amounting to two-thirds of the product of these sales did not make them integral parts of their interstate business. In fact, they lacked authority to engage by agent or otherwise in the retail transactions carried on by the local companies. Interstate commerce is a practical conception and what falls within it must be determined upon consideration of established facts and known commercial methods. Rearick v. Pennsylvania, 203 U. S. 507, 512; The Pipe Line Cases, 234 U. S. 548, 560. The thing which the receivers actually did was to deliver supplies to local companies. Exercising franchise rights, the latter distributed and sold the commodity so obtained upon their own account and paid the receivers what amounted to two-thirds of their receipts from customers. Interstate movement ended when the gas passed into local mains. The court below erroneously adopted the contrary view and upon it rested the conclusion that the public commissions were interfering with establishment of compensatory rates by the receivers in violation of their rights under the Fourteenth Amendment."

Counsel for plaintiff relies upon cases like Caldwell v. North Carolina, 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295; Crenshaw v. Arkansas, 227 U. S. 389, 33 Sup. Ct. 294, 57 L. Ed. 565. But they are clearly inapplicable. In those cases orders were taken for goods to be shipped from other states. They were shipped to the agent of the vendor, who delivered them to the parties who had given him the orders. The goods were never placed in stock, but delivered as they arrived.

There is no allegation in the complaint of the case at bar that his orders for films were sent from New York or any other state, and shipped to the Omaha branch for delivery to him. On the contrary, the allegations are that, after receipt of them by the managers of the Omaha branch, plaintiff would lease them from the manager. Wagner v. City of Covington, 251 U. S. 95, 40 Sup. Ct. 93, 64 L. Ed. 157, is conclusive as to the inapplicability of these cases to a state of facts as alleged by plaintiff in his complaint.

In our opinion the complaint fails to show that the transactions complained of were in interstate commerce, and for this reason the court properly directed a verdict. As to the other ground which the court mentioned for directing the verdict, we need not pass on it, nor would it be proper to do so, as the court was without jurisdiction.

The judgment is affirmed.

SANBORN, Circuit Judge (dissenting). The question in this case is: Do the facts alleged in the complaint show that the business conducted by the plaintiff, the contracts made and transactions had by him with the defendants, or any of them, which he alleges they conspired to suppress, and did suppress, constitute interstate commerce? The complaint contains averments of these facts:

Certain defendant corporations of the state of New York, named in the complaint, which either manufactured, owned, or distributed, from their places of business in New York City, moving picture films, which they had there completed or approved, and who, for convenience, will be termed "producers," after perfection and approval of these films,

were accustomed publicly to announce from time to time by advertisements that these films would be released, which meant that they would be sent out from New York by express or parcel post to branches or agents which they had in various cities, one of which was in Omaha, Neb., to be delivered by the agents to those who hired and paid for the use thereof by displaying them in the theaters in the vicinities of these respective branches or agents. The plaintiff was the owner of one theater, the operator of two or three others, and for the operators of several other theaters he selected, secured, and distributed to them the use of picture films which producers leased for this purpose. The defendant producers leased the use of their films for exhibition by the plaintiff, and by the operators in Nebraska and vicinity for whom he selected such films, from their New York offices through their branch offices or agents in Omaha. The producers accomplished this by entering into written and oral contracts with the plaintiff substantially on the terms and conditions set forth in Exhibits A, B, and C, attached to the complaint. By the terms of these contracts the producers retained the title, the control, and the right to recall these films at their home offices in New York.

The nature of these contracts and the character of the commerce transacted under them appears from Exhibit A, which was a contract between the defendant, the Goldwyn Corporation of New York, a producer, styled in the agreement the "exchange," and the plaintiff, Binderup, lessee of the moving picture films described therein, who was called in the contract "exhibitor." By this agreement the "exchange" agreed to furnish the "exhibitor," at the former's branch office in Omaha, one print of each of 26 photoplays, beginning with the motion picture released September 9, 1917, to let to the exhibitor the right and license publicly to exhibit and display each of said prints in the Opera House Theater, in the city of Franklin, Neb., and at no other place, and that the exhibitor should have the right to the first run of each of said prints in Franklin, Neb. The exhibitor agreed to accept and publicly exhibit for two consecutive days the first of the prints on September 27, 1918, and each successive print every second Friday thereafter for a like number of days; that he would pay the exchange for the use of and the right to exhibit each of said prints for the number of days specified $10; that he would deliver back to the exchange and pay the cost thereof at its branch office, if in the same city in which the exhibitor's theater was located, or if the exchange maintains no office in said city (and it probably did not in Franklin) to the office of the express company or other carrier designated by the exchange, or if an express carrier or other carrier is not so designated, to the nearest proper express company, or to the most rapid carrier service, immediately after the close of the performance upon the last day of exhibition of the respective prints, each of the prints in the metal can and shipping case furnished therewith, correctly and legibly addressed for reshipment in accordance with direction and advices previously given or to be given by the exchange, and that he would pay all expenses or other carriage charges incurred in shipping the films to the exhibitor.

This contract contained also agreements that it should not be binding

upon the exchange, unless countersigned and approved on its behalf by one of its officers in the city of New York, and that it and every term and condition thereof should be deemed an agreement made, executed, and delivered in the state of New York, and that they should be construed according to the laws and statutes of that state. The sample contracts, Exhibits B and C, attached to the petition, differed from Exhibit A in the names of the producers, the moving picture films described, and other such details; but they contained substantially the same provisions that have been recited from Exhibit A. There are other averments in the complaint which point in the same direction as those which have been recited.

The averments recited, however, have convinced me that these contracts, the shipments of the films from New York to Nebraska for the plaintiff pursuant thereto, the delivery thereof to the plaintiff by the agents or branches of the producers in Omaha for his use in accordance with the terms of the contract, all constituted parts of interstate commerce between the plaintiff and the New York producers, which, according to the averments of the plaintiff, their alleged unlawful acts first unreasonably restrained and then suppressed. If the producers had agreed with the plaintiff to sell these films to him and to ship them to their branches or agents in Omaha, and there to deliver them to him upon his call and if they had performed that contract, there could be no doubt that the transactions between the producers and the plaintiff constituted interstate commerce. It seems to me that contracts to lease the use of films, to ship the films from New York to Nebraska and deliver them upon the call of the lessee at the branches or offices of the agents of the producers in the same way, and the performance of such contracts, must also constitute such commerce.

The averments of this complaint are in effect that the entire business and all the transactions between the defendant producers and the plaintiff were founded upon these contracts between the producers, corporations of the state of New York, whose officers in New York executed and approved them, and the plaintiff, a citizen and resident of the state of Nebraska. These contracts provided that they should be construed by the laws and statutes of New York, that the producers would lease to the plaintiff, a Nebraska operator, for temporary display, and would ship from New York to him, to be delivered to him at Omaha by their branches or agents on his call, these moving picture films, which he agreed to display in theaters in the vicinity of Omaha, and immediately thereafter to return them to the producers. In my opinion, these agreements were contracts to engage in interstate commerce. Their performance was interstate commerce. The alleged conspiracy of the defendants to suppress that commerce, and its suppression, constituted a violation of the Anti-Trust Act of Congress. The court below therefore had jurisdiction of the issues presented by the averments of the complaint and the denials of the answers in this case. United States v. Motion Picture Patents Co. (D. C.) 225 Fed. 800; United States v. United States Shoe Machinery Co. (D. C.) 234 Fed. 127, 143, 144: Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1, 17, 84 C. C. A. 167; Swift & Co. v. United States, 196 U. S.

375, 396, 397, 25 Sup. Ct. 276, 49 L. Ed. 518; Loewe v. Lawler, 208 U. S. 274, 300, 302, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Dahnke-Walker Milling Co. v. Bondurant (December 12, 1921) 257 U. S. ——, 42 Sup. Ct. 106, 66 L. Ed. ——; Lemke, Attorney General, v. Farmers' Grain Co. (February 27, 1922) 257 U. S. ——, 42 Sup. Ct. 244, 66 L. Ed. ——.

And it seems to me that the judgment of the court below ought to be reversed, and this case ought to be remanded to that court for a new trial.