Argued October 7, 1938; modified January 17; rehearing
denied March 7, 1939

## In re Hayes' Estate
## *McGRAW et al. *v.* HOLMAN
(86 P. (2d) 424, 87 P. (2d) 766)

---

Department 1.

*Fletcher Rockwood* and *Charles E. McCulloch,* both of Portland (Carey, Hart, Spencer & McCulloch, of Portland, on the brief), for appellants.

*Dean H. Dickinson,* of Portland, for respondent.

ROSSMAN, J. This is an appeal from an order of the probate department of the circuit court of Multno-

mah county, entered March 24, 1938, which determines that the value of the estate of Edward Stephen Hayes, deceased, subject to inheritance taxation, is $1,042,-435.14; that the inheritance tax payable by it is $81,291.57; and that the collateral inheritance tax on the shares of the beneficiaries is $56,172.67. The latter includes a challenged tax of $7,490.76 upon the share of Donald Hayes McGraw, the adopted son of Ruth Hayes McGraw, daughter of the decedent. The total of the above tax is $137,464.24. The appellants, Ruth Hayes McGraw and Edmund Hayes, are the two children of the deceased. They appealed, not only in their individual capacities but also as the executors of the estate.

The order just mentioned succeeded one entered on February 19, 1937, which found that the value of the net estate of the same decedent, subject to taxation, was $592,435.14; that the inheritance tax was $35,018.51; and that the collateral tax upon the shares of the beneficiaries was $25,306.67; being a total of $60,325.18. The executors, being satisfied therewith, paid the latter sum. The order of March 24, 1938, was made after the State Treasurer had presented objections to the first order, and the probate department had sustained them.

This cause presents the following issues: (1) Was the situs of the personal property which the probate department employed as the basis for increasing the net value of the estate from $592,435.14 to $1,042,435.14, that is, $450,000, in Illinois, where the executors say that it was, or in Oregon, as the State Treasurer contends; and (2) was Donald Hayes McGraw (the adopted son of Ruth Hayes McGraw, daughter of the decedent) a "lineal descendant of deceased" within the contemplation of the first paragraph of § 10-603,

Oregon Code 1930, as amended by 1933 Session Laws, chapter 199.

There is no controversy concerning the facts—they are set forth in a stipulation of the parties. Edward Stephen Hayes, the deceased, who was 79 years of age at the time of his death, February 11, 1936, had been domiciled for more than fifty years preceding 1933 in Eau Claire, Wisconsin, where he practiced medicine and accumulated a large estate. In September, 1933, he moved to Oregon and established a domicile in Multnomah county. There, as a retired physician, he resided for two years and five months before death overtook him.

For a period of more than ten years prior to August 15, 1935, Harris Trust & Savings Bank, an Illinois corporation, had acted as the agent of the decedent and as the custodian of most of his securities. These consisted of bonds and stocks listed upon the security exchanges. As financial agent, the bank collected dividends on the stocks, income upon the bonds and the principal of the latter whenever maturities occurred. The sums collected were credited to Dr. Hayes' checking account. Upon request the bank made investments for him. The following is quoted from the stipulation:

"The bonds and stock certificates from time to time owned by the decedent and held for decedent's account by Harris Bank were never physically present or situated within the State of Oregon, but were at all times while owned by decedent physically present and situated in Chicago in the State of Illinois."

Other securities owned by Dr. Hayes which were not listed upon the security exchanges were in his possession in Oregon after he had moved to this state. August 8, 1935, the bank possessed bonds owned by Dr. Hayes

of the market value of not less than $625,000. On the same day Dr. Hayes owned other personal property consisting for the most part of stocks and money on deposit in banks in an amount of approximately $400,000. We quote again from the stipulation:

"On or about August 8, 1935, decedent directed Harris Bank to sell and liquidate sufficient of said bonds, owned by decedent and held by Harris Bank, to procure a sum which together with cash balances in decedent's account with Harris Bank would equal $450,000.00, and directed Harris Bank to use the sum of $450,000.00 thus obtained to purchase, as decedent's agent, Federal Reserve Notes of the face value of $450,000.00. Said Harris Bank complied with said directions and between August 8, 1935, and August 12, 1935, as agent for decedent, sold in the open market bonds held by Harris Bank and owned by decedent, and from that source realized for decedent's account the sum of $176,062.01. On August 12, 1935, decedent borrowed from Harris Bank, on a demand promissory note, the sum of $183,937.99. On said date decedent had a balance in his checking account in excess of $90,000.00, in addition to any sums herein referred to. Thereupon and prior to August 15, 1935, Harris Bank, with the cash balances in decedent's account with said Harris Bank, derived to the extent of $176,062.01 from said sale of bonds, to the extent of $183,937.99 from said loan by Harris Bank, and to the extent of $90,000.00 from credit balances in decedent's account from other sources, purchased for decedent forty-five (45) Federal Reserve Notes of the denomination of $10,000.00 each, and numbered * * * of the value of $450,000.00, and decedent thereupon became the owner of said Federal Reserve Notes. All of said Federal Reserve Notes were thereupon and prior to August 15, 1935, placed in a safe deposit box rented by decedent, being box No. 2100, in the vault of Harris Safe Deposit Company, in the City of Chicago, Illinois, and remained in said box from the time they were placed therein until August 19, 1935. * * * .Between August 12, 1935,

and August 29, 1935, said Harris Bank, upon directions by decedent, and as decedent's agent, sold in the open market bonds held by said Harris Bank in said agency account, and as proceeds of said sales were received by it, paid said proceeds to itself on account of said demand note, and on August 29, 1935, said demand note was thus paid in full by decedent."

August 17, 1935, the bank executed a trust instrument which Dr. Hayes, as settlor, had signed in Oregon two days previously. This instrument provided that the trust which it created should be irrevocable and should be known as the "Edward Stephen Hayes Trust Number One, dated August 15, 1935." By its terms Dr. Hayes sold and assigned to the bank the aforementioned 45 federal reserve notes and instructed it to "invest and reinvest all funds from time to time available for investment or reinvestment in whatever form of property real or personal the trustee, in the exercise of its discretion, shall deem proper and for the best interests of the trust estate." The instrument directed the trustee, however, before making investments, to obtain the written approval of certain of the beneficiaries of the trust named in the instrument. The beneficiaries of the trust were the daughter Ruth, the son Edmund, their spouses and their children. Dr. Hayes reserved no control whatever over the above federal reserve notes after having assigned them to the bank, and the trust instrument gave him no voice in the management of the trust. It made no provision for payment to him of any part of the principal or income. The stipulation recites:

"The transfer by decedent of said Federal Reserve Notes to said Harris Bank of said agreement of August 15, 1935, was made by decedent in contemplation of his death."

After the trust instrument had been signed the bank invested the aforementioned $450,000 in securities. Concerning the latter, the stipulation states:

"Property thus purchased by the use of said Federal Reserve Notes has at all times after August 19, 1935, been held and administered by said Harris Bank, as trustee of said Edward Stephen Hayes Trust Number One. None of the property thus acquired by said trustee for said Edward Stephen Hayes Trust Number One was ever owned by decedent, and in particular, said trustee did not purchase or otherwise acquire for said Edward Stephen Hayes Trust Number One any of the bonds or other assets which at any time were owned by decedent or which at any time constituted a part of the property held by said Harris Bank as agent for decedent."

Sepembter 19, 1935, Dr. Hayes, as settlor, and the bank, as trustee, executed another trust instrument which created "Edward Stephen Hayes Trust Number Two, dated September 19, 1935." This instrument transferred from Dr. Hayes to the bank securities possessing a par value of $295,359.20. The income of this trust was reserved to Dr. Hayes for his lifetime and there was also reserved to him the power to revoke the trust or modify any of its terms. Upon the death of Dr. Hayes $33,000 of the principal of the estate became payable to nine individuals mentioned in the instrument. The income from the remaining principal was payable to his widow, and after her death to the McGraw and Hayes families in a manner similar to that described in Trust Number One. The appellants present no contention that the assets of Trust Number Two were not subject to the inheritance tax exactions of this state. Their brief expressly states: "The executors have never contended that the assets of Trust Number Two are not subject to inheritance tax." Nor do they

contend that any part of the estate, except that included in Trust Number One, is exempt from the tax laws of Oregon. Section 10-601, Oregon Code 1930, provides:

"All property within the jurisdiction of the state, * * * whether tangible or intangible, which shall pass or vest by * * * will * * * grant, bargain, sale or gift, or as an advancement or division of his or her estate made in contemplation of the death of the grantor, * * * shall be and is subject to tax at the rate hereinafter specified * * *."

It will be observed from the fact stated in preceding paragraphs that the property which Dr. Hayes sold and assigned to the bank was the federal reserve notes. It was their transfer, if any, which was subject to the tax with which we are concerned. In order to obtain these federal reserve notes he used funds on deposit with the Chicago bank, borrowed some money and sold bonds until he had a total of $450,000. Then he purchased the notes. However, neither his preceding deposit nor the securities which were sold before the necessary cash was realized were conveyed to the bank. Nothing was conveyed to it except the federal reserve notes. Likewise, Dr. Hayes did not sell nor transfer to the bank the securities which the bank later purchased with the federal reserve notes. It is clear that he did not transfer to the bank those securities because he never owned them. Thus, the property which he assigned and transferred to the bank was the federal reserve notes. We repeat that if any transaction was taxable it was the transfer of these notes from Dr. Hayes to the bank.

■ The layman's word for federal reserve notes is paper money. In 31 U. S. C. A., § 462, it is stated:

"All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associ-

ations) heretofore or hereafter coined or issued, shall be legal tender * * *.''

In *Blodgett v. Silberman*, 277 U. S. 1, 72 L. Ed. 749, 48 S. Ct. 410, the court held that "a small amount of cash, $287.48, in bank notes and coin in a safe-deposit box" was "tangible property and cannot be distinguished from the paintings and furniture * * *." Thus, these federal reserve notes were not intangibles —mere choses in action—but were tangible personal property. See, in addition to the decision just cited, *Snodgrass' Estate*, 22 Pa. D. & C. 598, and *Waldron's Estate*, 84 Colo. 1, 267 P. 191. Had Dr. Hayes sold or assigned to the bank $450,000 worth of gold bullion, grain or any other kind of tangible personal property, the legal character of that property would have been no different than the federal reserve notes. Thus, the subject-matter of the transaction between him and the bank was tangible personal property.

■ The stipulation recites that the transfer of the federal reserve notes was made in contemplation of death. It is well settled that under the Fourteenth Amendment to the federal Constitution the privilege of taxing the right of succession to the ownership of tangible personal property can be exercised only by the state which has jurisdiction over the property; that is, by the state in which the property has acquired an actual situs. It is unnecessary to support this statement with the citation of authority, but the following decisions illustrate its application: *City Bank Farmers' Trust Co. v. Schnader*, 293 U. S. 112, 79 L. Ed. 228, 55 S. Ct. 29; *Blodgett v. Silberman*, 277 U. S. 1, 72 L. Ed. 749, 48 S. Ct. 410; *Frick v. Pennsylvania*, 268 U. S. 473, 69 L. Ed. 1058, 45 S. Ct. 603, 42 A. L. R. 316; *Haas v. Holman*, 143 Or. 141, 21 P. 795; and *In Re Brown's Estate*, 274 N. Y. 10, 8 N. E. (2d) 42.

The state contends that the situs of all personal property, whether tangible or intangible, is presumptively the same as the domicile of its owner, and cites in support of that contention *Endicott, Johnson & Co. v. Multnomah County*, 96 Or. 679, 190 P. 1109, and *Callender Nav. Co. v. Pomeroy*, 61 Or. 343, 122 P. 758. In the first of these dicisions the court was concerned with accounts receivable—intangible personal property; in the second with steamboats that plied the Columbia river calling at various ports in Oregon and Washington. These vessels were not permanently located at any one place. In the following quotation from *Union Refrigerator Transit Co. v. Kentucky*, 199 U. S. 194, 50 L. Ed. 150, 26 S. Ct. 36, 4 Ann. Cas. 493, the federal Supreme Court indicates that the presumption upon which the state relies is virtually confined to intangible personal property:

"There are doubtless cases in the state reports announcing the principle that the ancient maxim of *mobilia sequuntur personam* still applies to personal property, and that it may be taxed at the domicil of the owner, but upon examination they all or nearly all relate to intangible property, such as stocks, bonds, notes and other choses in action. We are cited to none applying this rule to tangible property, and after careful examination have not been able to find any wherein the question is squarely presented, unless it be that of Wheaton v. Mickel, 63 N. J. Law, 525, where a resident of New Jersey was taxed for certain coastwise and seagoing vessels located in Pennsylvania. It did not appear, however, that they were permanently located there. The case turned upon the construction of a state statute, and the question of constitutionality was not raised. If there are any other cases holding that the maxim applies to tangible personal property, they are wholly exceptional, and were decided at a time when personal property was comparatively of small amount,

and consisted principally of stocks in trade, horses, cattle, vehicles and vessels engaged in navigation. But in view of the enormous increase of such property since the introduction of railways and the growth of manufactures, the tendency has been in recent years to treat it as having a situs of its own for the purpose of taxation, and correlatively to exempt at the domicil of its owner."

 Thus, the situs of tangible personal property is determined in the same way as issues concerning the domicile of its owner. The latter does not necessarily determine the situs of the owner's tangible personal property. We realize that the statute with which we are concerned does not theoretically levy an ad valorem tax upon the property itself, but imposes an excise upon the privilege of testamentary transfer. Nevertheless, since the amount of the excise is determined by the value of the property, the tax is, for all practical purposes, a tax upon the property itself. The courts make no distinction, based upon the nature of the tax, in determining the jurisdiction over the property. Thus, in *Re Brown's Estate,* supra, the court stated: "Respecting jurisdiction over the thing taxed, there can be no distinctions between general property and inheritance taxes." From the state's brief, we quote: "In deciding questions of territorial jurisdiction of taxes, the United States Supreme Court draws no distinction between a property tax and an excise tax such as that in the case at bar. Frick v. Pennsylvania, 69 L. Ed. 1058, 268 U. S. 437, 492."

The state contends that the taxation situs of tangible personal property is determined, apart from presumptions, by the place where its owner permanently places and uses it. While it emphasizes the word "permanent", it concedes that "the decisions only require a

showing of 'more or less permanent location.' * * *
The facts must show a more or less permanent use or
location of the property in that place without immedi-
ate intention of removing or disposing of the same.''
The executors express themselves as satisfied with
this test ''if the terms are correctly defined.'' Cooley
on Taxation (4th ed.), § 452, states:

''The governing rule as usually stated is that the
taxable situs depends on whether the property is 'per-
manently' within the state. However, in this connec-
tion the word 'permanently' is apt to be misleading
unless read in connection with the facts of the particu-
lar case. It means a more or less permanent location
for the time being.''

Instead of quoting further from the definitions, we
shall examine the facts in all of the decisions which
the parties cite. In *Blodgett v. Silberman,* supra, the
item was ''a small amount of cash, $287.48, in bank
notes and coin in a safe-deposit box in New York.'' The
deceased had been domiciled in Connecticut and that
state contended that the above item ''should be treated
as attached to the person of the owner and subject to
a transfer tax at the domicile.'' The decision stated:

''To money of this amount usually and easily car-
ried on the person, it is said that the doctrine of *mobilia
sequuntur personam* has peculiar application in the
historical derivation of the maxim. But we think that
money, so definitely fixed and separated in its actual
situs from the person of the owner as this was, is tan-
gible property and cannot be distinguished from the
paintings and furniture held in the Frick case to be
taxable only in the jurisdiction where they were.''

In *Frick v. Pennsylvania,* 268 U. S. 473, 69 L. Ed.
1058, 45 S. Ct. 603, 42 A. L. R. 316, the deceased had
been domiciled in Pennsylvania. His estate, besides
including real and personal property in Pennsylvania,

possessed art treasures known as "the Frick Collection", housed in a building in New York City especially constructed for the purpose. The art collection was worth $13,132,391. A Pennsylvania statute provided that in determining the amount of the tax to be levied at death upon the transfer of property of any person domiciled in Pennsylvania, the value of all of his property, whether in that state or elsewhere, should be totalled. In applying this statute, the Pennsylvania officials included the New York art collection. The federal Supreme Court held that the collection should have been excluded because its situs was in New York.

In *City Bank Farmers' Trust Co. v. Schrader*, 293 U. S. 112, 79 L. Ed. 228, 55 S. Ct. 29, Thomas B. Clarke, the deceased, domiciled in New York, owned a collection of pictures which he had loaned in March, 1928, to a Pennsylvania museum. He died in January, 1931. His estate contested a tax which Pennsylvania imposed upon the right of transfer and which was based upon the value of the pictures. In sustaining the tax, the federal Supreme Court declared:

"It does not appear that Clarke ever intended to have the pictures returned to New York at any definite date or upon the happening of any event or at all. * * * The location of the portraits in Pennsylvania was not merely transient, transitory or temporary, but it was fixed in an established abiding place in which they remained for a long time. Undoubtedly, they became subject to the taxing power of the state. * * * By sending them into Pennsylvania and by his omission to have them returned to New York, and his lack of definite intention ever so to do, Clarke failed to maintain an actual situs in New York and created one for them in Pennsylvania."

In *Southern Pacific Company v. Kentucky*, 222 U. S. 63, 56 L. Ed. 96, 32 S. Ct. 13, it was held that

vessels engaged in the coastwise trade which belonged to the Southern Pacific Company, a Kentucky corporation, were taxable by Kentucky. The vessels called at various ports, but remained in none of them longer than was required to discharge the business in which they were engaged. The court pointed out:

"A ship is not intended to stay in port but to navigate the seas. Its stay in port is a mere incident of its voyage, and to determine that it has acquired an actual situs in one port rather than another would involve such grave uncertainty as to result often in an entire escape from taxation."

We employed the same rule in *Callender Nav. Co. v. Pomeroy,* supra.

In *Union Refrigerator Transit Co. v. Kentucky,* 199 U. S. 194, 50 L. Ed. 150, 26 S. Ct. 36, 4 Ann. Cas. 493, the court held invalid a tax imposed by Kentucky upon the entire fleet of 2,000 cars owned by the transit company when it appeared that the number of cars employed in that state in 1897, 1898, 1899 and 1900 was, respectively, 28, 29, 40 and 67. The court declared:

"It is also essential to the validity of a tax that the property shall be within the territorial jurisdiction of the taxing power. Not only is the operation of state laws limited to persons and property within the boundaries of the state, but property which is wholly and exclusively within the jurisdiction of another state, receives none of the protection for which the tax is supposed to be compensation. * * * The argument against the taxability of land within the jurisdiction of another state applies with equal cogency to tangible personal property beyond the jurisdiction."

See to same effect, *State v. Pullman-Standard Car Mfg. Co.,* 235 Ala. 493, 179 So. 541, 117 A. L. R. 498.

In *Brown v. Houston,* 114 U. S. 622, 29 L. Ed. 257, 5 S. Ct. 1091, the court sustained a tax levied by Louisiana upon coal shipped from Pennsylvania to New Orleans by plaintiffs, who were domiciled in Pennsylvania. The coal was upon the barges in the Mississippi when Louisiana imposed the tax. All of it was in the possession of the plaintiff's sales agents. The decision states:

"It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans. It might continue in that condition for a year or two years, or only for a day."

In *American Steel & Wire Co. v. Speed,* 192 U. S. 500, 48 L. Ed. 538, 24 S. Ct. 365, it appeared that the company, a manufacturer of steel products, was a New Jersey corporation with a plant located in Chicago, from which it shipped to the Patterson Transfer Company, Memphis, Tennessee, hardware to go into the transfer company's warehouse and eventually to fill the needs of the company's customers in the southwestern states. In sustaining a tax imposed by Tennessee upon the Memphis stock, the decision stated:

"With these facts in hand we are of opinion that the court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis, and were there held in store at the risk of the Steel Company, to be sold and delivered as contracts for that purpose were completely consummated."

In *General Oil Co. v. Crain,* 209 U. S. 211, 52 L. Ed. 754, 28 S. Ct. 475, the court sustained an inspection tax imposed by Tennessee upon the plaintiff, a Tennessee corporation. The court deemed the latter fact imma-

terial and considered the question of the validity of the tax from the standpoint of the general power of the state to tax. The oil had been shipped to the plaintiff's Memphis plant from its refineries in Ohio and Pennsylvania. The Memphis plant supplied the plaintiff's customers in the southwestern states. A part of the plant was a tank marked "oil already sold in Arkansas, Louisiana and Mississippi." Oil placed in it had already been sold to customers in those states and remained in the tank only long enough for reshipment. Another tank was marked "oil to be sold in Arkansas, Louisiana and Mississippi." Its contents were designated by that title. The controversy concerned the oil in those tanks. In sustaining the tax, the court declared:

"The company was doing business in the state, and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation * * * it required storage there—the maintenance of the means of storage, of putting it in and taking it from storage."

*Bacon v. Illinois*, 227 U. S. 504, 57 L. Ed. 615, 33 S. Ct. 299, sustained the validity of a tax imposed by Illinois upon a quantity of grain which the plaintiff, a broker and resident of that state, had stored temporarily in a Chicago grain elevator. The grain had been grown outside of Illinois and its growers had effected arrangements with the railroads for its carriage to states beyond Illinois; subject to the privilege, however, of removing it from the cars in Chicago for the purpose of inspection, weighing, cleaning, sacking, etc. While the grain was in transit to Chicago the plaintiff purchased it and succeeded to the rights just indicated.

He removed it to his elevator, and while it was there Illinois imposed the challenged tax. The decision said:

"He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the State in an assessment for taxation."

*Minnesota v. Blasius*, 290 U. S. 1, 78 L. Ed. 131, 54 S. Ct. 34, sustained a tax levied by Minnesota upon 11 head of cattle which the plaintiff, a trader in livestock, had in pens in a St. Paul stockyard. These cattle had been raised outside of Minnesota and had been shipped by their owners to the stockyards for sale. The plaintiff purchased them from commission merchants on April 30, 1929. The tax was assessed May 1, 1929, on which day the plaintiff sold seven of the cattle to a nonresident purchaser who immediately shipped them outside of Minnesota. The following day the remaining four were sold. While the plaintiff owned the cattle he kept them in pens leased by him from the stockyards company. He claimed that the tax violated the interstate commerce clause. In rejecting this contention, and in holding that the cattle were subject to taxation by Minnesota, the decision pointed out that the property had come to rest within the state of Minnesota, and that the plaintiff could there do with it as he pleased. It stated:

"He could sell the cattle within the State or for shipment outside the State. He placed them in pens and cared for them awaiting such disposition as he might see fit to make for his own profit."

In *Snodgrass' Estate*, 22 Pa. D. & C. 598, the decedent, who was domiciled at the time of his death in Pennsylvania, had spent the last nine winters of his life in California. In the spring of 1930, due to enfeeblement, he did not return to Philadelphia, and died in California August 4, 1930. At the time of his death there was found in a California safe-deposit box, which he had rented December 4, 1929, $89,500 in paper money, and in his room $326.66. The court held that all of this was tangible personal property, having a situs for purposes of inheritance taxation in California.

■■ The above constitutes a review of all of the authorities cited by the parties showing facts which the courts have held determine the taxation situs of tangible property. It is apparent that if such property must gain a permanent location in the state before its taxation can become valid, much of it would never be taxed for the reason that much of it never gains a permanent abiding place. Real property, being immovable, of necessity, has a permanent location. But tangible personal property, such as federal bank notes, may wander into every state in the Union before final retirement. Bank notes and other forms of money achieve a high degree of velocity as they discharge the demands of commerce. We repeat, if tangible personal property could not be taxed until it had found a permanent abiding place much of it would escape taxation altogether; in fact, by occasionally moving across state lines all of it would fare well. But if such property is subject to taxation in whatever state has, for the time being, become its home or headquarters, that is, the place where its present owner principally uses or keeps it, then we are keeping abreast of present commercial practices. The above-reviewed decisions indicate that Cooley in his above quoted language, was guilty of no misstatement

when he said that "permanent situs" as employed in connection with property of this kind "means a more or less permanent location for the time being." The terms "permanent" and "more or less permanent" are important to avoid taxation of such property in more than one state. When property of this kind is more or less permanently located in a state, other than that of the domicile of its owner, it is not taxable in the latter. The residence of the owner may throw light upon issues concerning the place where he generally uses or keeps the property; or indicate whether it is kept permanently of only temporarily in the tax-levying state. His residence is immaterial if it appears that the property has gained an actual situs within the tax-levying state. It is not necessary that both the owner and the property should be located in the state which has imposed the tax. In our belief, the place where the property's owner principally keeps or uses it constitutes for it a sufficient situs for taxation purposes.

In the present instance, the federal reserve notes were permanently in Illinois during Dr. Hayes' ownership of them. No one ever acquires such property or any other form of paper money with any thought of holding it for extended periods of time. Dr. Hayes never intended that the notes should leave Illinois during his ownership. At his request they were placed in his vault by his bank. Clearly, it cannot be said of them that they were merely temporarily out of Oregon—Dr. Hayes, as just indicated, never had any intention of bringing them into Oregon. The period of his ownership was brief, possibly no longer than five days, but in *Brown v. Houston,* supra, *American Steel & Wire Co. v. Speed,* supra, *General Oil Co. v. Crain,* supra, *Bacon v. Illinois,* supra, and *Minnesota v. Blasius,* supra, the period of time was also brief. In the latter case it was

a matter of only a few hours. We realize that in those cases the courts were primarily concerned with the interstate commerce clause of the federal constitution. Nevertheless, each decision sustained a property tax. They involved issues not merely concerning interstate commerce but also of taxation situs. In *Snodgrass* *\Estate,* supra, a few months sufficed to give a very large sum of money a taxation situs in California. In *Blodgett v. Silberman,* supra, the period of time is not stated in the opinion in months and days, but may have been very brief. However, time is not the only element. An equally important factor is whether the property was placed in the taxing state by its owner, there to render to him service of a substantial character. In the present instance, the notes rendered in Illinois the only usefulness which they ever performed for Dr. Hayes. They enabled him to transfer to the trustee something of a definite value, incapable of price fluctuation, in a form which the trustee, under the supervision of the beneficiaries of the trust, could readily convert into securities possessing the qualities which both trustee and beneficiaries preferred.

In all of the above decisions the tax was sustained when it appeared that (1) the property had come to rest within the state which levied the tax; (2) its owner intended it to remain there for the time being; and (3) while within that state it performed for him the service which he expected of it. Those three qualities subjected the property to the tax. In the present instance, none of those elements is present in favor of Oregon, since (1) the property was never in this state; (2) its owner never intended it should enter this state; and (3) it performed no service for him here.

Small sums of money carried about on one's person may readily be presumed to have their situs in the

domicile of the owner. In that respect they are no different from the ring which he wears upon his finger or the watch in his vest pocket. But forty-five ten-thousand-dollar bills certainly do not fall into this category; especially not when they were acquired in another state for the purpose of transferring them to a bank in that state, to be followed later by their conversion through the bank, as trustee, into permanent investments. It is not difficult to assume that such bills employed in such transactions may acquire for themselves an independent situs.

Had Dr. Hayes purchased, instead of federal reserve notes, some of the refrigerator cars described in *Union Refrigerator Transit Co. v. Kentucky,* supra, and had used them in Illinois for a period of five days or so, with no thought of taking them out of Illinois, their situs in that state would have been more evident; and yet the legal character of cars is no different from that of these notes.

Before arriving at a conclusion, let us take note of the other facts. Apparently Dr. Hayes had not made his fortune in this state. He came here as a retired physician and after the present economic depression had begun to shrink values of all securities. He kept in Illinois the only bank account mentioned in the stipulation and most of his securities. It was some of these securities, the bank account and money borrowed from the Illinois bank which made up the fund for the purchase of the notes. In other words, none of the money came from Oregon and none of it had ever been here. His stocks and bonds were intangibles, and property of that kind is generally said to have its situs at its owner's domicile. The rule just mentioned had its origin before the volume of notes, stocks, bonds,

accounts receivable, etc., had achieved their present proportions and was formulated when most personal property, apart from the owner's livestock, was closely identified with his person; that is, it consisted principally of his jewels, apparel, furniture and trinkets. However, stocks, bonds, notes and accounts receivable may be more clearly identified with their owner's business than with his person; that being true, the courts have begun to speak of the "business situs," or the "commercial domicile" of intangibles, especially when they have become a part of a business. In such instances the law of the place where they are kept and used may determine their taxation: *Wheeling Steel Corp. v. Fox,* 298 U. S. 193, 80 L. Ed. 1143, 56 S. Ct. 733, and *Safe Deposit & Trust Co. v. Virginia,* 280 U. S. 83, 74 L. Ed. 180, 50 S. Ct. 59, 67 A. L. R. 386. We shall make no attempt to determine whether the situs of the intangibles which provided the source of payment for the tangibles was in Illinois or in Oregon. We assume that it was in the latter place, and have dwelt upon the proceeding only for the purpose of showing that, since Dr. Hayes kept his securities in Illinois, a belief that he intended to keep his tangibles in the same place is greatly fortified.

■ But the state, impliedly admitting that Dr. Hayes' course of action conferred an actual Illinois situs upon the notes, if his purpose was honest, claims that he intended to escape taxation, and that, therefore, his purpose was defeated. The court in *State v. Pullman-Standard Car Mfg. Co.,* supra, in which a foreign corporation had formed a local corporation for the purpose of reducing its Alabama franchise tax, states:

" 'A taxpayer may resort to any legal method available to him to diminish the amount of his tax liability.'

And in Gregory v. Helvertin, 293 U. S. 465, 55 S. Ct. 266, 79 L. Ed. 596, 97 A. L. R. 1355, 'The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.' That is exactly this situation. This taxpayer has simply and only set itself up in conformity to the law and proposes to pay the taxes which the law says are payable when so set up. The State cannot complain when the taxpayer resorts to a legal method available to him to compute his tax liability. The State is now saying to him that although you did what we said you could do with a certain result, that result is more beneficial to you than we intended. This Court cannot change the law as thus made by our Constitution and statutes.''

Certainly, if a taxpayer marries to reduce his taxes, his purpose will not be defeated nor will the marriage become invalid. He may for the same reason change his residence or the nature of his investments. Should he neglect to collect his accounts receivable in order to lessen his tax, his purpose will succeed notwithstanding the fact that the tax collector deplores the result. The taxpayer's success in each of the above instances would be due to the fact that he had done nothing unlawful. Purpose never renders a course of action unlawful if the law blazes the course. The following is taken from Cooley on Taxation (4th ed.) § 548:

''Likewise if the owner of personalty changes it into real estate, and then executes leases for years thereon in order to avoid taxation on such personalty, the assessment must nevertheless be governed by the legal position of the property at the time it is made. In each of these cases the party is merely exercising a right which the law allows to him; he may choose his own place of residence at pleasure, and he may select, as seems most for his interest, between taxable and nontaxable property; and it is no concern of others, or

even of the state which by its laws allows the choice, what may be the motive on which he acts * * *. On the other hand, taxation cannot be avoided (1) by a plan in itself unlawful or (2) by a plan lawful in itself, not actually carried out, which is a mere subterfuge to escape taxation. If the transaction is merely a temporary change of property from nonexempt into exempt property, made shortly before the assessment, with the intent of restoring the property to its original form after the assessment, there is such fraud as warrants taxation of the property; * * *''

*Shotwell v. Moore,* 129 U. S. 590, 32 L. Ed. 827, 9 S. Ct. 362, is the decision upon which Cooley principally relies to support the sentence last quoted. In it the taxpayer, a day or two before the second Monday of April (the tax listing day) of the years 1881, 1882, 1883, 1884, and 1885, had on deposit in a bank in Ohio the following sums, respectively, $30,900, $26,900, $29,500, $18,560 and $4,700. Each year just before tax listing day he checked out his balance and received greenbacks which he placed in an envelope and handed to the cashier, who placed it in the bank's vault. A day or two later the taxpayer accepted the return of the envelope and redeposited the money. He did this for the purpose of escaping taxation since bank balances were taxable but greenbacks were exempt. The statute provided: ''Each person required to list property shall annually * * * on the day preceding the second Monday of April'' list his property; but another section of the same statute taxed ''the monthly average amount or value for the time he held or controlled the same * * * of all moneys, credits or other effects, within that time invested in or converted into bonds or securities of the United States * * *.'' The court held that Shotwell was taxable upon the monthly aver-

ages which he had converted into greenbacks. He escaped taxation upon the bank balances, but in so doing subjected himself to the result just mentioned.

Dr. Hayes' plan was lawful. It contemplated the conversion of his bonds into federal reserve notes and the transfer of the latter to a trustee which he empowered to invest the trust res under the supervision of the beneficiaries. No one contends that this plan was unlawful. Dr. Hayes, therefore, met the first test suggested by Cooley. His plan was carried out. The state admits that the bonds were sold, cash was raised and federal reserve notes to the extent of $450,000 were purchased. Then the trust indenture was drafted and signed, and, finally, the trustee proceeded with the performance of its duties. Accordingly, both tests have been met. The state relies upon *Poppleton v. Yamhill County*, 8 Or. 337, and *Shotwell v. Moore*, supra. In the first of these, the plaintiff, a resident of Yamhill county, owned notes and mortgages aggregating $12,209.25, which, in order to invalidate a tax, he claimed he had pledged to two individuals in Multnomah county as security for a loan of $1,000. He argued that his securities were not assessable by Yamhill county. The county contested the good faith of the transaction, and its equalization board, after a hearing in the course of which Poppleton submitted his evidence, found that the transaction was not consummated in good faith. This court, in holding that substantial evidence supported the board's findings, pointed out that obviously Poppleton could not have been in need of money when he purportedly borrowed $1,000 because at that time he was loaning money to others; that $12,000 security for a debt of $1,000 indicated that the transaction was not genuine, and that after he had

made the pledge he still retained control over at least one of the mortgages. In other words, the evidence indicated that the alleged transaction concerning the mortgages had never taken place. We reviewed *Shotwell v. Moore* in the preceding paragraph.

Certainly, the state has pointed out to us nothing unlawful which Dr. Hayes did. That being true, the mere fact that he planned to lessen the taxes collectible upon his estate no more tainted his transaction with illegality than if he had discontinued the drinking of tea in order to avoid the payment of a tax upon it. To have defeated his purpose it would have been necessary either that he have done something which was unlawful, and which, therefore, never could achieve a result cognizable by the courts, or that he have failed to carry through his plan to a consummation. Neither of these alternatives took place and, therefore, the illegality upon which the state depends is not present.

■ We now express our conclusion. Since neither the securities nor the cash which made up the fund for the purchase of the federal reserve notes was ever in Oregon, and since the notes were not brought into this state, but remained in Illinois during Dr. Hayes' ownership of them, performing there the only service which they ever rendered to him, their taxation situs was in Illinois.

■ We deem it immaterial whether or not a tax was levied upon the notes in Illinois. The fact concerning that matter is not disclosed by the stipulation; but the situs of the notes does not depend upon the taxation laws of other states.

The remaining issue is: Was Donald Hayes McGraw, the legally adopted son of Dr. Hayes' daughter, the "lineal descendant" of Dr. Hayes. Section 10-603,

Oregon Code 1930, after graduating according to the size of the estate, the amount of the tax, says:

"The above tax on the estate shall be in full of all inheritance tax on any device * * * gift * * * which shall pass to or for the use or benefit of any grandfather, grandmother, father, mother, husband, wife, child, stepchild or any lineal descendant * * *."

Beneficiaries who are not included within the designations just mentioned are subject to collateral tax. Section 33-407, which is a part of our laws governing the adoption of children, provides:

"A child so adopted shall be deemed, for the purposes of inheritance of such child, and all other legal consequences and incidents of the natural relation of parents and children, the child of the parents by adoption, the same as if he had been born to them by lawful wedlock; except that he shall not be capable of taking property expressly limited to the heirs of the body or bodies of the parent by adoption, nor property from the lineal or collateral kindred of such parents by right of representation."

Section 10-104, which is a part of our laws of descent and distribution, is in the precise words of the paragraph just quoted. The executors contend that these sections of our laws made Donald the lineal descendant of Dr. Hayes. In other words, they made Donald, according to the executors, Dr. Hayes' grandchild. Vol. 1, Am. Jur., Adoption of Children, § 63, after taking note of the fact that the statutes, giving an adopted child rights to inherit, have not received uniform construction, states:

"It is the general view that there is not conferred upon the child a right to inherit from the lineal or collateral kindred of the adoptive parent unless the language of the statutes is clearly to that effect."

Vol. 2, C. J. S., Adoption of Children, § 63d, states:

"Under the principle that a stranger to the adoption proceedings who has never recognized the existence and the artificial relation created thereby should not have his property diverted from the natural course of descent without a clear expression of such intent, it is generally held that a right to inherit through an adoptive parent, from collateral kin of the latter, is not to be readily implied from the relation, and is to be recognized only if expressly conferred. Accordingly, in the absence of such express provision, it is generally held that an adopted child cannot inherit from the ancestors of the adoptive parent, nor from natural children of such parent, nor from collateral kindred, and this has been held even through the statute expressly provided that the child should inherit through the adoptive parent as fully as if he were a natural child."

From *Re Bradley's Estate,* 185 Wis. 393, 201 N. W. 973, 38 A. L. R. 1, we quote:

"Text-writers generally lay down the rule that under statutes of adoption which declare the adopted child to have all the rights, including that of inheritance, of a child born in lawful wedlock, the adopted child is not constituted an heir of the collateral kindred of the adoptive parents. 1 R. C. L. p. 621; 1 C. J. p. 401; Spencer, Dom. Rel. 422; 3 Thomp. Real Prop. pp. 398, 399; 1 Woerner, Administration, p. 204. This has been held in many cases, among which we cite the following: * * *"

Vol. 1, Am. Jur., Adoption of Children, § 63, states further:

"According to the weight of authority, under a statute placing an adopted child upon an equality with natural children for the purpose of inheriting from the adopting parents, the adopted child, for other purposes, is unlike children by birth, and hence such child has no right of inheritance through his adopted parents."

The following three decisions bestowed painstaking labor upon issues similar to the problem that confronts us: *Re Bradley's Estate*, supra; *Batcheller-Durkee v. Batcheller*, 39 R. I. 45, 97 Atl. 378, L. R. A. 1916E 545; *Hockaday v. Lynn*, 200 Mo. 456, 98 S. W. 585, 8 L. R. A. (N. S.) 117, 118 Am. St. Rep. 672, 9 Ann. Cas. 775. These decisions, together with the two texts from which we quoted above and the annotation in 38 A. L. R., p. 8, cite all of the authorities which have come to our attention. The three decisions review virtually all of the authorities.

In *Batcheller-Durkee v. Batcheller*, supra, the court was confronted with a statute exactly like §§ 10-104 and 33-407, Oregon Code 1930, with the exception of a single proposition, an immaterial circumstance. The court held that the statute conferred upon the adopted child only the right of inheritance from its adoptive parents, and that it did not enable him to inherit through them. Construing the effect of the exceptions mentioned in the statute and the adopted child's contentions concerning them, the decision stated:

"We rather deduce the contrary inference from this language,—that it is more in denial than in allowance of inheriting directly from the kindred of the adopting parents. This clause is introduced by way of exception from what had before been granted,—the right of inheritance; and, as by our interpretation the right so given is to inherit from the adopted parents only, the exception is to the right of inheriting from or through the adopting parents, the provision being, in meaning, that the adopted child shall not be deemed so much a child of the adopted parents that he can, as their representative, inherit from their kindred, lineal or collateral. If, then, as being the adopted child, such child be not permitted to represent and stand in the place of the adoptive parent, and take by repre-

sentation from the kindred of such parent, it would seem that much more he should not take directly from such kindred. This whole excepting clause at the close of the 5th section is pointed to inheriting from or through the adoptive parents, the first branch of it being that the adopted child shall not take property expressly limited to the body or bodies of the parents by adoption, and the second that he shall not take property from the lineal or collateral kindred of such parents by right of representation. The language is all restrictive of inheriting from or through the adoptive parents, and an adopted child being made, 'to all legal intents and purposes, the child' of the adopting parent, there would seem to be the more reason that, as representing and standing in the place of the adoptive parent, he should take by right of representation from such parent's kindred than that he should take directly from such kindred; and any implication there may be from the prohibition to take by right of representation should rather be against than in favor of the right to take directly.''

We concur in those views. In *Keegan v. Geraghty,* 101 Ill. 26, a statute, in all of its essentials similar to ours, was held to confer a right of inheritance only from the person adopting and not from the lineal or collateral kindred of the adopting parent.

We cannot hold that Donald's share is rendered exempt by the above statute unless we believe that he is a lineal descendant of Dr. Hayes; in other words, believe that when the latter's daughter adopted Donald she thereby made him the adopted grandson of her father, and conferred upon him the rights of a lineal descendant of the purported grandparent. Parents adopt a child voluntarily; the relationship, although governed by statute, is contractual. All who are strangers to the contract are free from its consequences unless the statute renders them subject to its terms. Un-

doubtedly, the primary purpose of adoption statutes is, as stated in *Batcheller-Durkee v. Batcheller, supra,* "to promote the welfare of children by securing to them the benefits of a home and parental care." That being true, the adoption imposes upon the parents and the child the same duties, obligations and rights within the family circle as if the child had been born to his adoptive parents in lawful wedlock.

■ It is, however, a tenet of natural justice, favored by our social system and our jurisprudence from feudal days, that the property of an intestate descends to kindred of his blood; and even our law of wills favors the same principle by rendering wills invalid which wholly ignore the children. Anyone who seeks to set aside a principle so interwoven through our entire social system must point to statutory words of no doubtful meaning. The statute must leave no reasonable alternative. The consequences of the interpretation which the executors submit would be momentous. Such an interpretation would allow the adoptive parents not only to choose a child for themselves, but a relative, possessed of inheritable rights, for all of their kin.

■ It is our opinion that adoption under the sections of our code above mentioned created a relationship personal between the adoptive parents and the child. It does not make the latter a lineal descendant of the adopting parents. In addition to the authorities already cited, we add: *The Estate of Sunderland,* 60 Iowa 732, 13 N. W. 655; and *State v. Goettelman's Estate,* 192 Iowa 808, 185 N. W. 468.

It follows from the above that the order of the circuit court pertaining to the interest of Donald Hayes Mc-Graw is affirmed. The part which imposes a tax upon

Trust Number One is in error. The cause will be remanded for the necessary modifications.

RAND, C. J., and KELLY, J., concur.

———

BAILEY, J. (dissenting in part). In my opinion, Donald Hayes McGraw, the legally adopted son of Ruth Hayes McGraw, daughter of Dr. Hayes, was not the lineal descendant of Dr. Hayes within the meaning of § 10-603, Oregon Code 1930. Therefore, I concur in that part of the opinion of the majority of the court that so holds.

It is impossible, however, for me to concur in the view expressed by the majority of the court that so much of the estate of Dr. Hayes as went to make up the $450,000 constituting the Edward Stephen Hayes trust No. 1 is not subject to the inheritance tax law of the state of Oregon. In this connection it must be borne in mind that the stipulation is to the effect that this trust was created by Dr. Hayes in contemplation of death.

The trust instrument is dated August 15, 1935. On August 8 of that year Dr. Hayes had with the Harris Bank of Chicago, Illinois, bonds of the par value of $691,000, which bonds had a market value of not less than $625,000. On or about that date Dr. Hayes instructed the Harris bank to sell and liquidate sufficient of the said bonds owned by him and held by the bank as his agent to make up a sum which together with cash balances in his account with the Harris bank would equal $450,000. At that time Dr. Hayes had a balance in excess of $90,000 in his checking account with the Harris bank.

On August 12, 1935, the Harris bank sold in the open market bonds belonging to Dr. Hayes, realizing there-

from $176,062.01, and on the same day Dr. Hayes borrowed from that bank on a demand promissory note the sum of $183,937.99, which amount added to the sum realized from the sale of bonds on that date totaled $360,000. This, together with the $90,000 in his checking account, made up $450,000. The amount which Dr. Hayes borrowed from the bank was all repaid on or before August 29, 1935.

My view of the matter is that this method adopted by Dr. Hayes was a mere subterfuge to escape payment to the state of Oregon of inheritance tax on a large part of his estate. The transfer of that $450,000 by Dr. Hayes could have been made much more simple and direct by giving the bank a check on his checking account and having the money loaned to him turned over to the trustee, rather than purchasing federal reserve notes, placing them in a safety deposit box rented by him for a few days and then transferring them to the trustee to make up the amount of the trust fund.

The majority opinion quotes from Cooley on Taxation, 4th Ed., § 548. The latter part of the excerpt reads thus: "On the other hand, taxation can not be avoided (1) by a plan in itself unlawful or (2) by a plan lawful in itself, not actually carried out, which is a mere subterfuge to escape taxation. If the transaction is merely a temporary change of property from nonexempt to exempt property, made shortly before the assessment, with the intent of restoring the property to its original form after the assessment, there is such fraud as warrants taxation of the poperty". Although the purchase of the said federal reserve notes by the Harris bank at the instance of Dr. Hayes was in itself lawful, the method adopted in creating this trust fund was, in the language of the text-writer, merely a tempo-

rary change of intangible property to tangible property, without any intent to have it retain the latter form, and was merely a subterfuge to avoid payment of inheritance taxes to the state of Oregon on the property involved.

The effect of the majority opinion is to render it extremely simple for a resident of Oregon having a large estate to avoid the payment of inheritance taxes to the state. All that is necessary to defeat the Oregon inheritance tax law is to buy federal reserve notes, rent a safety deposit box in Washington, Idaho, California, or any number of states, place the notes in such box or boxes, and then turn the said notes over to a trustee or trustees for reinvestment in intangibles.

By adopting the method of avoiding the Oregon inheritance tax resorted to in the case at bar, it may be possible for an estate to escape payment of inheritance taxes in any state, for the reason that the states wherein trusts are created may not be advised that they are established in contemplation of death. But even if taxes are paid in such states, the aggregate amount of taxes will be much less than if payable wholly in one state, inasmuch as the higher rate of taxation on the greater part of the estate will be avoided.

For the reasons herein stated, I dissent from the opinion of the majority of the court.

---

Petition for rehearing denied March 7, 1939

ON PETITION FOR REHEARING

(87 P. (2d) 766)

ROSSMAN, J. The state has filed a petition for a rehearing and accompanying brief, both of which manifest concern lest our previous decision permits resi-

dents of this state, who desire to escape taxation, to sell their securities outside of this state, establish trusts with the proceeds, and thereby achieve their purpose.

■ In our previous decision we went to great length to point out that Dr. Hayes' acquisition of federal reserve notes in Illinois and his deposit of them there were not sufficient in themselves to give the notes an Illinois situs. We pointed out that (1) Dr. Hayes had resided less than two years in this state when the challenged transaction took place; (2) he never conducted any business in this state; (3) his fortune was made before he came here; (4) only a minor part of his securities was ever in this state; (5) his only bank account was with an Illinois bank; (6) the major part of his securities was in the possession of an Illinois trust company which collected sums due him, deposited them to his credit, honored his checks, and made investments for him; (7) the federal reserve notes were purchased with money thus accumulated: a Chicago bank account, money borrowed from a Chicago bank, and the proceeds from the sale in Illinois of bonds which had never been in this state; (8) he never planned to bring the notes into Oregon; (9) the notes were acquired for the purpose of enabling Dr. Hayes to effect a transaction with them in Illinois; and (10) the trustee that he chose was domiciled in Illinois and the trust res was kept in that state.

We shall now consider the sixth element again.

In *New Orleans v. Stempel*, 175 U. S. 309, 44 L. Ed. 174, 20 S. Ct. 110, the issue for determination was thus stated in the decision:

"Under the circumstances disclosed by the testimony, were the money and credits subject to taxation? It appears that these credits were evidenced by notes

largely secured by mortgages on real estate in New Orleans; that these notes and mortgages were in the city of New Orleans, in possession of an agent of the plaintiff, who collected the interest and principal as it became due and deposited the same in a bank in New Orleans to the credit of the plaintiff. The question, therefore, is distinctly presented whether, because the owners were domiciled in the State of New York, the money so deposited in a bank within the limits of the State of Louisiana, and the notes secured by mortgages situated and held as above described, were free from taxation in the latter state.''

In rejecting the contention of the New York owner that these securities were not taxable in Louisiana, the court quoted from many authorities, and we now quote from its decision:

''In Goldgart v. People, 106 Illinois, 25, 28, the court said: 'If the owner is absent, but the credits are in fact here, in the hands of an agent, for renewal or collection, with the view of reloaning the money by the agent as a permanent business, they have a situs here for the purpose of taxation, and there is jurisdiction over the thing.' * * * This proposition was reaffirmed in People ex rel. v. Smith, 88 N. Y. 576, in which the Court of Appeals of that State held that a resident of New York was not liable to taxation on moneys loaned in the States of Wisconsin and Minnesota on notes and mortgages, which notes and mortgages were held in those States for collection of principal and interest and reinvestment of the funds, it appearing that property so situated within the limits of those States were there subject to taxation. See also * * * '' The decision sustained the Louisiana tax.

In *Hall v. Miller,* 102 Tex. 289, 115 S. W. 1168, the plaintiff, domiciled in Missouri, owned notes of the value of $116,285, which were in the possession of his agents located in Texas. These notes arose out of sales

by his agents of Texas property. Payments made to the agents upon the notes from time to time were deposited by them in a Texas bank to the credit of the plaintiff, and the latter drew upon the account as his needs required. In holding that the notes were taxable in Texas, the court declared that they had acquired a business situs in that state, and depended largely upon *New Orleans v. Stempel,* supra. See to same effect *Monongahela River Consolidated Coal & Coke Co. v. Board of Assessors,* 115 La. 564, 39 So. 601, 2 L. R. A. (N. S.) 637, 112 Am. St. Rep. 275.

In *Ewa Plantation Co. v. Wilder,* 289 Fed. 664, the plaintiff, a Hawaii corporation, was represented in San Francisco by an agent. The latter sold sugar produced by the plaintiff and deposited the sums received in a San Francisco bank to the credit of the plaintiff. Against these deposits the plaintiff drew from time to time. The San Francisco agent also possessed securities owned by the plaintiff, but had no authority to make investments. The decision stated:

"The plaintiff in error contends that the bonds, notes and deposits here in question have become localized and have acquired a business situs in San Francisco, and they cite cases in which foreign held bonds have been taxed at the place of their situs irrespective of the owner's domicile. The general doctrine of these cases is expressed in De Ganay v. Lederer, 250 U. S. 376, 39 Sup. Ct. 524, 63 L. Ed. 1042. In that case stocks and bonds issued by Pennsylvania corporations, and mortgages on real estate in Pennsylvania, were owned by an alien nonresident but were in the hands of an agent, a Pennsylvania corporation, authorized to sell, assign, and transfer them and to invest and reinvest the proceeds as it might deem best under a power of attorney to represent the owner and in the owner's behalf to vote and act at all meetings of corporations connected with such stocks and bonds. It was held

that the income derived from the stocks and bonds was subject to taxation under the Income Tax Law of 1913. The court said: 'We have no doubt that the securities herein involved are property. Are they property within the United States? It is insisted that the maxim mobilia sequuntur personam applies in this instance, and that the situs of the property was at the domicile of the owner in France. But this court has frequently declared that the maxim, a fiction at most, must yield to the facts and circumstances of cases which required it; and that notes, bonds and mortgages may acquire a situs at a place other than the domicile of the owner, and be there reached by the taxing authority.'

"In that case the significant facts were that the stocks and bonds were in the hands of a local agent empowered to sell and dispose of them or any of them according to his own judgment, to reinvest at his discretion, to hold the same for the owner's account, and to represent the owner and manage generally the owner's business affairs * * *.''

Having so quoted, the decision pointed out that the San Francisco agent had no authority to make investments or reinvestments, and held that the money was taxable in Hawaii. In other words, mere authority to collect and deposit in a bank did not give a local business situs.

In *Crane Co. v. Des Moines,* 208 Iowa 164, 225 N. W. 344, 76 A. L. R. 801, the court held that $35,000 of bank accounts possessed by the plaintiff's agency in Des Moines were taxable in Iowa. The plaintiff was an Illinois corporation with its principal place of business in Chicago. Its Des Moines agency sold the plaintiff's products, collected the book accounts, deposited the sums collected in a Des Moines bank, and periodically remitted the proceeds to the home office. The company

challenged an Iowa tax levied upon the bank accounts. In holding that they were subject to Iowa taxation, the court declared that the company had given them a business situs independent of its domicile. It cited with approval *Marshall Wells Hardware Co. v. Multnomah County*, 58 Or. 469, 115 P. 150, wherein this court sustained a tax upon accounts receivable in the sum of $225,000 held by the Portland branch of the Marshall Wells Hardware Company, a New Jersey corporation, the principal office of which was located in Minnesota. That company maintained a branch in Portland and also a bank account varying in amount from $3,000 to $5,000. In sustaining the tax, this court, after reviewing many supporting decisions, said:

"In the case before us the choses in action were a part of the Oregon business, arising from sales made here, and the only evidence concerning them was in the hands of the Portland manager and were collectible by him; and whether the debtor is in or out of the state these debts are a part of the capital of the Oregon business, and were properly taxable in Multnomah County."

In the present instance, the stipulation of the parties states:

"As such agent said Harris Bank had collected income and principal on said bonds and dividends on stocks, had credited income so collected to a checking account of decedent in Harris Bank, subject to decedent's order, had acted as decedent's financial agent in his investments in bonds, stocks, and reinvestments in bonds and stocks of moneys received from maturities of principal of bonds and of moneys derived by Harris Bank from sales of bonds and stocks held by Harris Bank in said agency account for decedent. The bonds and stock certificates from time to time owned by decedent and held for decedent's account by Harris Bank were never physically present or situated within

the State of Oregon, but were at all times while owned by decedent physically present and situated in Chicago.''

Thus, the facts before us are similar to those which induced other courts, including the federal supreme court, to hold that securities were taxable at the place where they were constantly used; that is, where they had gained a business situs. Had the situation been reversed and the securities been maintained in this state by an elderly individual domiciled in Illinois, who, upon retirement from active pursuits, had conferred upon a local agent the authority possessed by the Harris Bank, we feel certain that Oregon would have believed that the securities had gained a local situs, that the fiction mobilia sequuntur personam was inapplicable, and that the securities were subject to Oregon taxation. It would have pointed out that the securities and the various transactions which were taking place constantly concerning them had the benefit and protection of the laws of this state—the quid pro quo for which tax money is taken. In view of the above, a belief that Dr. Hayes intended to give an Illinois situs to the federal reserve notes, and never intended to bring them into Oregon, is greatly fortified.

Let us now consider further the tenth element stated in the second paragraph of this decision.

In *Safe Deposit & T. Co. v. Virginia*, 280 U. S. 83, 74 L. Ed. 180, 50 S. Ct. 59, 67 A. L. R. 386, the court held that securities in the possession of a trustee domiciled in Maryland were not taxable in Virginia, that being the domicile of the two beneficiaries of the trust, who were, respectively, five and eight years of age when the trust was established. The latter was to continue until the beneficiaries reached the age of twenty-five.

In speaking of the doctrine of mobilia sequuntur personam which Virginia invoked, the court declared:

"Here, where the possessor of the legal title holds the securities in Maryland, thus giving them a permanent situs for lawful taxation there, and no person in Virginia has present right to their enjoyment or power to remove them, the fiction must be disregarded. It plainly conflicts with fact; the securities did not and could not follow any person domiciled in Virginia. Their actual situs is in Maryland and cannot be changed by the cestui que trust."

The situation in the present instance is substantially similar to that pictured in the language just quoted. The record does not disclose the residence of the beneficiaries of Dr. Hayes' trust.

The annotator in 67 A. L. R., at page 393, states:

"As a general principle, unless modified by statute, an executor, administrator or trustee is regarded as the owner, for purposes of property taxation, of the personal property which he holds by virtue of his office, and is taxable in the state in which he is domiciled. Nor, in the absence of statute, is such situs affected by the fact that the beneficiaries are not residents; or by the fact that the decedent was domiciled in, and the executor, administrator or trustee, as the case may be, receives his authority from the court of, another state. * * *"

Thus, the notes were acquired with the proceeds from assets which were never in Oregon, but which, under the foregoing decisions, had acquired a business situs in Illinois. The notes were never brought into this state and their owner's only intention was to keep them in Illinois during his ownership. The notes were obtained for the purpose of enabling Dr. Hayes to consummate a transaction in Illinois with an Illinois bank; and, finally, upon the consummation of the transaction,

the notes, upon becoming the trust res, definitely had an Illinois situs.

In our previous decision we pointed out that tangible personal property is taxable in the place where it is permanently located; that is, more or less permanently. We also pointed out that in determining whether the property has acquired a location of a more or less permanent character the type of property must be taken into consideration; for instance, perishables have a permanency of very short duration; money may last for centuries and yet change hands daily. The permanency for purposes of taxation is determined, not by the life of the article but by the duration of each individual's ownership. In the present instance Dr. Hayes owned the federal reserve notes for a span of only a few days, but during that time the notes were in Illinois and, as already indicated, Dr. Hayes intended that they should remain there. He there engaged in a business transaction with them which constituted the only use to which he ever put them.

Without further analysis, we remain satisfied that the taxation situs of these notes was not in Oregon. To make the matter entirely clear, we state that we have considered all of the foregoing facts, and have not based our conclusion upon only one or two of them, as the State seems to believe. We do not mean to say, however, that each and every one of them was entirely essential.

The petition for a rehearing is denied.

RAND, C. J., and KELLY and BAILEY, JJ., concur.